[Cite as *State ex rel. Aaron's, Inc. v. Ohio Bur. of Workers' Comp.*, 2014-Ohio-3425.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Aaron's, Inc., | : | |
| Relator, | : | |
| v. | : | No. 13AP-170 |
| Ohio Bureau of Workers' Compensation, | : | (REGULAR CALENDAR) |
| Respondent. | : | |

D E C I S I O N

Rendered on August 7, 2014

*Fisher & Phillips LLP, Daniel P. O'Brien* and *Mark E. Snyder*, for relator.

*Michael DeWine*, Attorney General, and *Cheryl J. Nester*, for respondent Bureau of Workers' Compensation.

IN MANDAMUS
ON OBJECTION TO THE MAGISTRATE'S DECISION

DORRIAN, J.

{¶ 1} In this original action, relator, Aaron's, Inc., requests a writ of mandamus ordering respondent, Bureau of Workers' Compensation ("bureau"), to vacate the order of the administrator's designee applying retroactively its reclassification of certain employees and back-billing Aaron's for the maximum two years permitted under Ohio Adm.Code 4123-17-17(C). Relator requests that the writ order the bureau to prospectively apply the reclassifications.

{¶ 2} This action comes to the court as a result of the granting of a limited writ and a remand to the bureau by the Supreme Court of Ohio to explain why the bureau denied relator's request that the reclassification be applied prospectively only. *State ex rel. Aaron Rents, Inc. v. Ohio Bur. of Workers' Comp.*, 129 Ohio St.3d 130, 2011-Ohio-

3140.  The administrator's designee held a hearing and again denied relator's request that the reclassification be applied prospectively only.  The administrator's designee did so on the basis of the magnitude of misreporting and the scope of the reporting discrepancies. Relator filed the present original action in response to the same.

{¶ 3}  Pursuant to Civ.R. 53(D) and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto.  The magistrate found that the magnitude of the misclassification of employees was a sufficient basis for the administrator's designee to deny the request that the misclassification be applied prospectively only.  Thus, the magistrate determined that the administrator's designee did not abuse its discretion granted to him under Ohio Adm.Code 4123-17-17(C).  Further, the magistrate observed that relator cited to no case or authority that holds that retroactive billing can only be premised upon the intentional wrongdoing of the employer and that *State ex. rel Roberds, Inc. v. Conrad*, 86 Ohio St.3d 221 (1999), strongly suggested otherwise.  Therefore, the magistrate recommended that this court deny the requested writ of mandamus.

{¶ 4}  Relator has filed the following objection to the magistrate's decision:

> The Magistrate's conclusion that the magnitude of misclassi-fication was a sufficient basis to support application of the maximum twenty-four month retroactive back-billing period is not supported by the record.  In fact, the record evidence reflects that the [bureau's] own internal policy is to "go prospective on an audit" unless there is some intentional wrong-doing or disregard on the part of the employer.

{¶ 5}  With regard to the argument that it was an abuse of discretion to conclude that the magnitude of misclassification was sufficient basis to support application of the retroactive back-billing, this is not a new argument and is essentially a reiteration of the same argument previously made to and addressed by the magistrate.  For the reasons stated in the magistrate's decision, we do not find merit to relator's objection.

{¶ 6}  With regard to the argument that a writ is warranted on the basis of an internal policy of the bureau, we reject this argument as said internal policy did not create a clear legal duty, nor a clear legal right, as required in order to issue a writ of mandamus.

{¶ 7} In its objection, relator points to the testimony of the bureau's regional supervisor of underwriting and premium audit that "it is normal policy to apply reclassifications prospectively, unless there is some fault on the part of the employer." (Objection, 6.) It further points to an e-mail by the bureau's director of employer management services to the bureau's director of employer compliance, stating that " '[t]he only exception I think there would be to prospective is a very obvious case of disregard to previous audit instructions.' " (Objection, 7.) Relator argues there was no previous audit or communication putting it on notice of any issues with payroll reporting.

{¶ 8} In *State ex rel Bledsoe v. Marion Steel Co.*, 10th Dist. No. 02AP-193, 2002-Ohio-6835, this court denied a petition by a claimant for a writ of mandamus to vacate an order denying permanent total disability compensation. The claimant had argued that the Industrial Commission of Ohio ("commission") had a clear legal duty, and, therefore, he had a clear legal right to the compensation, pursuant to an internal commission memorandum. The internal memorandum addressed conflict of interest and, according to the claimant, would have required rejection of a psychological examination conducted by a physician who was the business associate of the employer's expert. Noting the three criteria which must be met in order to issue a writ of mandamus, we rejected the magistrate's conclusion that the internal memorandum gave relator a clear legal right or that it imposed upon the commission any clear legal duty.

{¶ 9} Likewise, here, we note the three criteria which must be met in order to issue a writ of mandamus: (1) that relator has a clear legal right to the relief requested; (2) that the respondent has a clear legal duty to grant the relief requested; and (3) that he or she has no adequate remedy at law by which to vindicate the claimed right. *State ex rel. Hattie v Goldhardt*, 69 Ohio St.3d 123, 125 (1994), citing *State ex. rel. Berger v. McMonagle*, 6 Ohio St.3d 28, 29 (1983). We reject relator's argument that the internal policy to "go prospective on an audit" establishes a clear legal duty on the part of the bureau, or a clear legal right on the part of the relator, to apply the reclassification prospectively.

{¶ 10} Upon review of the magistrate's decision, an independent review of the record, and due consideration of relator's objection, we find the magistrate has properly determined the pertinent facts and concluded a writ is not warranted. We, therefore,

overrule relator's objection to the magistrate's decision. We adopt the findings of fact of the magistrate, as no objection was raised regarding same, and adopt and modify the magistrate's conclusions of law consistent with this decision. Accordingly, the requested writ of mandamus is hereby denied.

*Objection overruled; writ denied.*

KLATT and LUPER SCHUSTER, JJ., concur.

_____

# APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Aaron's, Inc., | : | |
| Relator, | : | |
| v. | : | No. 13AP-170 |
| Ohio Bureau of Workers' Compensation, | : | (REGULAR CALENDAR) |
| Respondent. | : | |

---

### M A G I S T R A T E ' S   D E C I S I O N

**Rendered on March 12, 2014**

---

*Fisher & Phillips LLP, Daniel P. O'Brien* and *Mark E. Snyder*, for relator.

*Michael DeWine*, Attorney General, and *Cheryl J. Nester*, for respondent Bureau of Workers' Compensation.

---

IN MANDAMUS

{¶ 11} In a prior original action, the relator, Aaron Rents, Inc., n.k.a. Aaron's, Inc. ("Aaron's" or "relator") unsuccessfully challenged in this court a decision of the Ohio Bureau of Workers' Compensation ("bureau") that reclassified its product technicians for purposes of premium calculation and applied the reclassification retrospectively under the 24-month provision of Ohio Adm.Code 4123-17-17(C). On appeal as of right, the Supreme Court of Ohio held that the bureau erred in failing to explain why it denied

relator's request that the reclassification be applied prospectively only. The Supreme Court reversed the judgment of this court and granted a limited writ.

{¶ 12} On remand, the administrator's designee conducted a hearing on January 17, 2012 and thereafter issued a decision that denies relator's request that the reclassification be applied prospectively only.

{¶ 13} In this original action, relator requests a writ of mandamus ordering the bureau to vacate the order of the administrator's designee and to enter an order that grants relator's request for prospective-only application of the reclassifications. In the alternative, relator requests that the writ order the bureau to vacate the January 17, 2012 order of the administrator's designee and to schedule a hearing before the bureau's adjudicating committee.

Findings of Fact:

{¶ 14} 1. Aaron's describes the historical development of its business operations in Ohio and its initial relationship to the bureau:

> Aaron's, Inc. (fka Aaron Rents, Inc., hereafter referred to as "Aaron's"), a Georgia corporation, provides retail services involving rental and lease ownership of residential and office furniture, consumer electronics and home appliances. There are three operating divisions of Aaron's: sales and lease ownership, corporate furnishings, and manufacturing. Aaron's began doing business in Ohio in 1992. Aaron's operations in Ohio are within the sales and lease ownership division. The company maintains an administrative office in Columbus, Ohio. Presently, there are approximately 300 Aaron's retail stores selling electronics, appliances and household furnishings in Ohio.
>
> When Aaron's came to Ohio in the early 1990's, its business consisted primarily of renting furniture. In 2000, the business began to evolve into primarily a rent-to-own operation.

(Stipulation of Evidence, exhibit Y.)

{¶ 15} 2. When relator initially applied to the bureau for workers' compensation coverage as a state-fund employer, relator's entire workforce was assigned manual 8810 with the exception of its product technicians who were assigned manual 8044.

{¶ 16} 3. Manual 8810 is captioned "Clerical Office Employees NOC [Not-Otherwise Classified]." Manual 8044 is captioned "Store: Furniture & Drivers."

{¶ 17} 4. One of the duties of a "product technician" is the delivery of merchandise to a customer's home or business. Delivery of merchandise involves the driving of a vehicle.

{¶ 18} 5. In April 2006, the bureau initiated an audit. However, the individual auditor assigned to perform the audit did not prepare an audit report until January 2007. His audit report covered the period July 1, 2004 through December 31, 2006. That audit report was rejected by the bureau on grounds that it failed the bureau's "quality review process."

{¶ 19} 6. In early 2008, the bureau initiated a new audit which covered the period July 1, 2004 to December 31, 2007. That audit was performed by C. D. Goellnitz, the bureau's regional auditing supervisor.

{¶ 20} 7. By letter dated April 16, 2008, relator, through counsel, contested the audit report.

{¶ 21} 8. On May 20, 2008, Mr. Goellnitz wrote to the bureau's adjudicating committee a "Statement of Facts":

> An audit was conducted on subject risk covering the periods of July 1, 2004 through December 31, 2007.
>
> Aaron operates a national chain of retail type stores specializing in lease to own sales of household goods, electronics and furniture. They have a large number of stores in Ohio. In addition to the stores they have a regional administrative operation and a regional warehouse in Columbus.
>
> The risk was initially assigned manuals 8044 Furniture and manual 8810 clerical. The assignment of 8044 was initially correct since the risk operation was predominately furniture but over time had developed more into electronics sales. Therefore manual 8044 which include drivers were replaced with manual 8017 Store Retail and 7380 Drivers. Manual 7380 covers delivery of merchandise and needs by rule to be separately rated from the store operation manual 8017.

The business has also expanded doing some service work on the electronic items and manual 9519 Household appliance service and repairs were added to cover this type of work since it needed to be separately rated with 8017 per NCCI classification rules. Manual 8742 Salespersons were added to cover traveling executives as well as internal audit.

The risk based on the manuals they were originally assigned was not reporting correctly. They had placed into manual 8044 its Production Techs, Warehouse, long haul drivers, warehouse manager and service techs. Under 8810 it had placed all other employees including the store managers, the store sales staff as well as all the regional staff.

The result of distributing the labor force into the proper classification resulted in a significant billing which the employer is protesting.

{¶ 22} 9. On September 24, 2008, relator's protest was heard by the bureau's three-member adjudicating committee. Thereafter, by unanimous vote, the adjud-icating committee issued an order denying relator's protest and retrospectively applying the reclassifications for the 24-month back period provided by Ohio Adm.Code 4123-17-17(C).

{¶ 23} The adjudicating committee order explained:

**The facts of this case are as follows:** The Bureau audited the employer for the period from July 1, 2004 through December 31, 2007. The auditor transferred payroll from NCCI manual code 8810 to Code 8017. Further drivers were moved from manual 8044 to manual 7380. The audit also added manual codes 8742 and 9519.

The employer objected to the audit findings and requested a hearing before the Adjudicating Committee.

* * *

At the hearing the employer representative gave a brief history of the employer's business. Originally, the nature of the operation provided equipment and furniture for rent to rent customers. Around 1998, the employer's operation changed to a rent to own business and established retail outlets or store fronts for direct business with customers in several locations throughout Ohio and nationwide. The employer is a Georgia corporation which reports having

yearly audits from their insurance company in other jurisdictions. In April 2006, the Bureau contacted employer for an audit; however, the Bureau failed to timely complete the audit. It was not until March 2008, that a second audit was completed and the audit findings provided to the employer. The employer has two objections to the audit. First, the employer objects to the assignment of manual 7380 and contends the employees assigned to this manual would be better placed under manual 8017. Manual 7380 is an NOC (not otherwise classified) classification and manual 8017 are more specific to the operation of the business. The employer representative conveyed that Travelers Insurance Company, which provides coverage for this employer in other jurisdictions and also utilizes NCCI, has classified the same drivers under manual 8017. The second objection to the audit involves the employer position that the audit findings should be prospective only from the date of the second completed audit of March 2008. Under OAC 4123-17-17(C) the Bureau may go back 24 months immediately prior to the current payroll period. The rule states the 24 [months] is calculated [from] the date the employer puts BWC on notice of errors or that BWC provides written notice to the employer of the bureaus intent to inspect examine or audit the employer's records. The employer representative contends the Bureau cannot go back 24 months from the date of the initial audit since it was never finalized. The employer representative argued the $2 million audit findings would unjustly enrich the Bureau and that the loss runs show the Bureau has already made an underwriting profit from this employer. The employer representative further noted the employer was reporting using the manuals assigned by the Bureau and payroll reports do not provide an opportunity to change the manual classifications assigned to the policy. The employer representative also argued that with the Bureau going back to 2004, yet never having conveyed the audit findings in 2006, the employer lost the opportunity to pursue other alternatives (e.g. self insurance, retrospective rating) which would have resulted in less liability. The delay in processing the initial audit in 2006 has harmed the employer.

The Bureau representative stated the employer was originally assigned manual 8044 and 8810. Audit findings indicated the employer sells and rent[s] furniture and other household items. The employer changed the operation of their business from selling mostly furniture to mostly

electronics therefore manual 8017 [was] assigned. There is a regional headquarters in Columbus. There are drivers who deliver and set up the equipment for the business as well as drivers that are also service techs for the equipment. Manual 8017 [does] not include drivers and therefore the driver classification was assigned. Significant payroll was moved from manual 8810 to manual 8017. Under the direction of NCCI and Ohio law, the drivers need to be placed under manual 7380. As to the audit findings being attributed back to July 1, 2004, the Bureau gave notice to the employer in 2006 of the need for an audit. The Bureau historically goes back two years from the date of notice of the audit to determine the two year period.

Given the information provided at the hearing, the Adjudicating Committee upholds the assignment of manual 8017 and manual 7380 to the policy. The NCCI Scopes Manual is clear that drivers are reportable to manual 7380 and that other operational employees are reportable to the store class of manual 8017. The employer's operations are best described by these classifications. The Bureau must report as classified under the Scopes Manual. The Bureau is bound by not only the NCCI Scopes Manual, but also Ohio law. The manner in which a private insurance carrier in a jurisdiction other than Ohio classifies drivers is not a consideration for this Committee. Therefore, the assigned manual classifications are affirmed. Regarding the back billing period of the audit, the Committee finds in light of the delay of processing the audit findings and the lack of proof that the Bureau ever provided written notice of the initial April 2006 audit or findings, the Bureau shall only make the audit findings limited to the payroll periods from January 1, 2006 through December 31, 2007.

(Emphasis sic.)

{¶ 24} 10. Relator administratively appealed the September 24, 2008 order of the adjudicating committee to the administrator's designee pursuant to R.C. 4123.291.

{¶ 25} 11. Following a February 10, 2009 hearing, the administrator's designee issued an order affirming the findings and decision of the adjudicating committee.

{¶ 26} 12. On March 6, 2009, relator filed in this court a mandamus action that was assigned case No. 09AP-232. On September 29, 2009, this magistrate issued his magistrate's decision.

{¶ 27} 13.  On January 26, 2010, this court issued its decision.  This court adopted this magistrate's findings of fact but not his conclusions of law.  This court denied the request for a writ of mandamus.  *State ex rel. Aaron Rents, Inc. v. Ohio Bur. of Workers' Comp.,* 10th Dist. No. 09AP-232, 2010-Ohio-218.

{¶ 28} 14.  Relator appealed as of right the judgment of this court to the Supreme Court of Ohio.

{¶ 29} 15.  On July 5, 2011, the Supreme Court issued its decision.   The court reversed the judgment of this court and granted a limited writ of mandamus.  *State ex rel. Aaron Rents, Inc. v. Ohio Bur. of Workers' Comp.,* 129 Ohio St.3d 130, 2011-Ohio-3140. The court explains:

> Under Ohio Adm.Code 4123-17-17(C), the bureau can make adjustments to an employer's account either prospectively or retroactively. *State ex rel. Granville Volunteer Fire Dept., Inc. v. Indus. Comm.* (1992), 64 Ohio St.3d 518, 520-521, 597 N.E.2d 127. ARI objects to retroactive reclassification and argues, among other things, that its ability to challenge the bureau's decision has been compromised because the order does not explain why retroactive rather than prospective reclassification was favored. We agree.
>
> We "generally defer[ ] to the [bureau's] expertise in premium matters," but we will intercede when an occupational classification has been made in an arbitrary, capricious, or discriminatory manner. *State ex rel. Progressive Sweeping Contractors, Inc. v. Ohio Bur. of Workers' Comp.* (1994), 68 Ohio St.3d 393, 396, 627 N.E.2d 550. The agency's expertise, moreover, "does not supersede the duty this court has imposed upon the Industrial Commission and the bureau to adequately explain their decisions." *State ex rel. Craftsmen Basement Finishing Sys., Inc. v. Ryan,* 121 Ohio St.3d 492, 2009-Ohio-1676, 905 N.E.2d 639, ¶ 15. An order must "inform the parties and potentially a reviewing court of the basis of the [agency's] decision." *State ex rel. Yellow Freight Sys., Inc. v. Indus. Comm.* (1994), 71 Ohio St.3d 139, 142, 642 N.E.2d 378.
>
> ARI contends that without an explanation why its request for prospective application was denied, it cannot know whether the imposition was arbitrary, capricious, or, in this case, punitive. ARI fears that the bureau retroactively reclassified its employees as punishment for what the bureau believed

was ARI's deliberate misclassification of its workers. ARI asserts that if that is the case, it deserves to know so that it can prove that the misclassification was unintentional and consistent with what it believed the bureau desired initially.

ARI's points are valid. There is no way to know why the bureau exercised its reclassification discretion as it did. Further explanation as to why the bureau reached its decision is necessary before we can determine whether an abuse of discretion occurred.

The judgment of the court of appeals is reversed, and a limited writ is granted ordering the bureau to vacate its order, further consider the matter, and issue an amended order including an explanation for its decision.

*Id.* at ¶ 9-13.

{¶ 30} 16. Relator filed in the Supreme Court of Ohio a request for clarification arguing that the court should clarify whether the adjudicating committee should hold a hearing prior to a hearing by the administrator's designee. In response, the bureau filed a memorandum opposing the motion for clarification. On September 21, 2011, without explanation, the Supreme Court denied relator's motion to clarify. *State ex rel. Aaron Rents, Inc. v. Ohio Bur. of Workers' Comp.,* 129 Ohio St.3d 1473, 2011-Ohio-4751.

{¶ 31} 17. On November 29, 2011, the bureau issued notice that the matter was scheduled for a hearing on January 17, 2012 before the administrator's designee.

{¶ 32} 18. Prior to the January 17, 2012 hearing, relator, through counsel, submitted a position statement. In its position statement, relator argued that the hearing should be held before the adjudicating committee, not before the administrator's designee. Relator also argued that the back-billing or retroactive application of the reclassifications is inequitable.

{¶ 33} 19. On January 17, 2012, the administrator's designee heard the matter before him on the limited writ and remand from the Supreme Court. The hearing was recorded and transcribed for the record.

{¶ 34} 20. At the hearing, relator's counsel called James W. Roberts, Jr., to testify on behalf of Aaron's. Mr. Roberts has been with Aaron's since 1990. His current position is director of financial projects. In 2006, he was the corporate operations controller.

While Aaron's risk management department had the final responsibility for workers' compensation matters, Roberts assisted in the creation of the report that risk management used to complete the semi-annual report to the bureau.

{¶ 35} In states other than Ohio, Aaron's was insured with "Travelers" for its workers' compensation coverage. West Virginia also had its own state system, as does Ohio.

{¶ 36} 21. Roberts testified as follows:

> Q. But my question is: Did you only produce information for Ohio or did you produce it for all states in which Aaron's operated?
>
> A. We produce it for all states.
>
> Q. So you had a database that you ran through payroll?
>
> A. Correct.
>
> Q. And you would extract that information?
>
> A. Based on what was requested from the vendor.
>
> Q. When you reported to the Travelers, how did they get the information? How did they use the information?
>
> A. The Travelers would come once a year, they would send an auditor out. And we would get a combination of our quarterly filing reports and they had specific reports that they would like us to pull from the system. We would then reconcile it. It would go look at the -- then go and classify each of the various codes as to what he thought was the correct code, then they would produce an audit report.
>
> Q. Do you have other monopolistic jurisdictions that you've dealt with other than the Travelers?
>
> A. Just the West Virginia.
>
> Q. How did West Virginia work?
>
> A. West Virginia, they -- they came and did an annual audit. We gave them the reports that they requested and, you know, it was just a very -- it was similar to the Travelers in that it

was an annual audit procedure and they reviewed everything.

Q. When was the first time you started handling anything from the Ohio Bureau and for Aaron's?

A. When I was the division controller starting in 1998, I think it was just outlined, we had two different -- two different divisions within our company, we had the rent-to-own corporate furnishings and we had the Aaron's sales and lease ownership.

We had the one store in Ohio, and I was responsible for filling out the information for that store starting in 1998. The division controller for the sales and lease division would fill out the information for the other part and then it was submitted to the risk management department, which would then fill out the form and send it in.

Q. When did you become responsible for all of Ohio?

A. In 2002 when I was changed from division controller to corporate operations controller.

Q. And what would you do to fill out the Ohio report at that point?

A. We would -- we would run a report from at that time the ADP system and then reconcile it to the unemployment reports that were filed with the state.

Q. And how did you --

A. And then we would put the information in the form and give it to risk management.

Q. Put in in the Bureau's reporting form?

A. Correct.

Q. The semiannual payroll report?

A. The six months, yes.

Q. Okay. And how did you make a determination as to who belonged in what category?

A. Mainly by looking at what my predecessors did and just listed those codes on there, so it seemed pretty much self-explanatory that drivers go in this code and the store people go in this code.

Q. So in other words, the 8044, which was one of your preliminary classifications you put the drivers in?

A. Correct.

Q. And then the 8810, which is the store people, you put all of the store people in?

A. Correct.

Q. When was the first time that you heard from -- well, I won't rehash that.

You heard from the Bureau in 2006?

A. Correct.

Q. What did they -- what kind of contact did you have at that point?

A. The -- I guess she was the audit coordinator. She asked -- she said we were going to have an audit and asked for lots of different reports and so forth. I -- everything she asked for, I produced and sent to her.

Q. Did you get any feedback from that?

A. She said there was -- she was going to -- she was going to -- as you mentioned, wanted someone to contact at the store to talk -- so for an auditor to talk to, I never talked to an auditor. But after that I never heard anything. So I made it to point to call back and see if there's anything with this audit, and she said everything was good, everything was -- no problems.

Q. So she told you there was no problems in 2006? When's the next time you heard from someone?

A. January 24th, 2008.

Q. And that was who?

A. Michael Lintner.

Q. And -- and he told you what?

A. He said that there's some issues related to the audit that they did in 2006 and we needed to discuss them and go over some of these -- the coding of some of these positions.

Q. Okay. So they -- in -- from 1998 you started working with the Ohio Bureau of Workers' Compensation, you sent them information based upon how you broke the codes down. 2006 there was the audit, you didn't hear anything about it other than it was okay?

A. Yes.

Q. And there was no problems with it?

2008 Mr. Lintner calls you, I believe Mr. Goellnitz called you slightly -- a week later?

A. Yes. It was -- I guess he -- Lintner sent an e-mail that was now assigned to Mr. Goellnitz and he made contact with me on 1/30/2008.

Q. And then the -- then what happened after that?

A. Well, as we were getting things together for that audit, it was on February 8th, 2008 that we got the e-mails with the link to the news story saying that we were cheating the system and all this sort of stuff, and that's when we -- we were like, well, this doesn't make sense with what you're trying to ask for, what's all this about? And we went from there.

Q. Was there anything about the Ohio information that caught your eye relative to payroll to losses during the course of this that would have been a red flag to say, boy, we might not be reporting correctly?

A. Well, since I was very familiar -- I work every year with the Travelers. With Ohio, all we did was fill out the semiannual form. So when you did it, it had the rate factors to calculate it out, so you obviously saw what the six-month

premium was. So, I mean, I did discuss with the -- James Cates, the vice president of risk management, you know, is this, you know, in line with what we're -- we're doing? Because as over payroll, as part of that job was, I could see who was on Workers' Comp. status within the company. And I -- I mean, I didn't see any volume there at all for these premiums we were paying. And so I thought, you know, compared to what we were paying, we didn't have any claims, so it just seemed like a strange situation.

Q. So you thought you were overpaying?

A. Correct.

Q. And did you talk to Mr. Cates about that?

A. He did -- since he is the expert in insurance and risk management, he said, well, we could go self-insure. It was something he was going to look into. I mean, he said there was more administrative cost to it, he might have to get some additional resources internally, and that he was going to look into it. It was just one of those things, what's best, to pay the premium for Ohio or to get the administrative work done internally?

(Tr. 31-38.)

{¶ 37} 22. Following Roberts' testimony, relator's counsel brought to the attention of the administrator's designee three internal e-mails between bureau employees that indicate the bureau's unwritten policy or practice regarding prospective versus retrospective application of audit findings. The e-mails were obtained by relator through a public records request.

{¶ 38} The first of the e-mails is from Joy Bush to Michael Glass and Michael Lintner sent April 23, 2008. Joy Bush was the bureau's executive director of employer management services. In that e-mail, Joy Bush states:

The only exception I think there would be to prospective is a very obvious case of disregard to previous audit instructions.

{¶ 39} The second of the e-mails is from Michael Glass to Goellnitz sent September 18, 2009 at 12:57 p.m.:

Normally we would go prospective on an audit if we felt the employer didn't know or couldn't have known proper reporting requirements or BWC failed to assign the code to their policy, etc. We must have felt that Aaron Rents knew how to report correctly and had the code. This can sometimes be established through a previous audit or some other documented communication with the employer. Do you recall this one?

{¶ 40} The third of the e-mails is Goellnitz's response to the Glass e-mail. On September 18, 2009, at 1:42 p.m., Goellnitz states:

Michael: I think what you need to look at is the original reporting. Picking a period in question say either the 1st half or second half of 2007. The employer reported in each period 1.7 million in 8044 and 5.5 million in 8810. If you look at the found 8742 (360K) and 8810 (40K) and say that is the payroll that we could see as being administrative and maybe they could call as 8810, that still leaves over 5 million dollars of operational payroll was misreported to the clerical manual. I think the driving factor for going retroactive is the margin of the error between operational workers and clerical workers. The feeling was that they should know the difference between an office and a store worker.

Following that logic if you want to have an argument for a long stretch to make a deal—could we say we give him one manual for operational people and one for clerical, based on what we think they should have known.

Now if the case was that the employer had divided his operational people and clerical people correctly—then I could see an argument to add a delivery classification or a repair manual on a prospective basis. The same way I could see making a change to make a traveling executive prospective if they were placed into a clerical classification.

If you recall this account was originally assigned 8044 which includes drivers and we have moved to 8017 where the delivery is separate rated. The percentage of a sales between 8017 items and 8044 items was very close and I think without digging it flip flopped from year to year. I believe it was decided to use 8017 because that was the manual that he seemed to be using more on a national basis.

You are also correct that we have applied classifications on a prospective basis if the employer had the wrong manual assigned to them, but I think we also look to see that the employers placement were reasonable. In this case from what I recall based on the percentages for Ohio I would think that it could be argued that 8044 and 8810 were the right manuals for this employer at least at the start of the audit.

{¶ 41} 20. At the January 17, 2012 hearing, relator's counsel argued:

And there is, in essence, an issue of fault associated with back billing. And the Roberds decision makes that relatively clear. Our arguments all along have been in this situation, the Bureau of Workers' Compensation assigned classifications in 1992. Didn't call my client, didn't write my client, didn't talk to my client, never sent an auditor out. And they had no idea how Ohio operated relative to the rest of the world. It's a monopolistic jurisdiction. West Virginia came down and audited every year.

But they had two classifications, the payroll report says you will -- you will not write anything else on this, and they continued to report what they thought was correct. In fact, when this came to Mr. Roberts' attention as he testified, he thought they were over paying, because he looked at the losses relative to the premiums and it just didn't make sense to him at that point in time.

Now, if you -- if you go back and you take a look at the two-year back billing, one of the things that the BWC has argued is that we have no legal right for prospective funding. I don't dispute that. It's not a right, it's not a matter that as a matter of case law or the Administrative Code or the Revised Code that we have a right to prospective billing. We've never argued that.

(Tr. 39-40.)

{¶ 42} 23. At the January 17, 2012 hearing, Mr. Goellnitz was called to testify:

So when you're looking at these questions, you've got to look at more than just saying, well, was the Bureau at fault that the employer didn't have the classification? I've sat here and listened to this today and the whole issue is, you know, we're talking a good-sized company. I don't know if they had representation, I didn't go back and look, by a third-party

administrator, but there is -- you can always pick up the telephone and contact the Bureau to ask questions.

You know, we've had multiple groups of people available that if an employer feels they are misclassified or, you know, are -- within various programs, the drug free, the premium discount programs that are available to people, and we do have Bureau people available to answer questions about our various functions. So just saying, you know, well, the Bureau never bothered to contact me, well, if there's a question or a problem, if I'm an employer and I think I'm over paying, I'm sure going to pick up the phone and probably try to find out if I am or I'm not. And that's not what happened here. This audit was generated by the Bureau. I think it was just routine when it started.

When you're looking at an employer's reason to make something prospective or not, you've also got to look at the manuals that are on the employer's payroll report, and he's got an obligation to fairly represent his payroll system based on the classifications that are assigned on that report. Meaning, basically in our case scenario here, we had 8044, which is a store-type classification, and we have an 8810 classification that is for clerical office.

Now, logically in fairness would require that you would be able to place your payroll between an operational function, which would be stores, deliveries, and other people that do have direct employer contact with those that are sitting in an office environment.

The classification system that is in use is NCCI. That is the same classification system that is used by Travelers. So when you look at this account, your major driving area with this is the fact that the employer has misreported payroll into the clerical classification, and that is really the driving factor on why he had such a large billing. And that is probably the most important point of the reason why this audit would be billed retroactive than it would be the other way of then making it prospective.

* * *

I said -- Mr. O'Brien brought up this e-mail between Michael Glass and others. Yeah, if the employer would have fairly represented or fairly distributed the payroll between

operational and clerical, it is my opinion that we would have made this audit finding prospective. But when you have millions and millions of dollars of payroll that has been reported to a clerical classification and its operational people, that kind of limits what we have to do here.

There's a large amount of debt caused by the fact that the employer has not fairly reported its payroll system to the State of Ohio. We make audits prospective if, for example, we have one mercantile classification and maybe it should be under another. But the placements between the office and the mercantile or between operational and nonoperational employees was fairly represented.

The same thing is true as if an employer was misclassified and he leaves off -- only reports one quarter of payroll, for example, leaves off these -- leaves off the other one, probably, you know, not done deliberately, we cannot make that type of audit prospective. We're going to have to bill them and collect off of a reasonable amount of premium based on what he should have reported to us based on the manuals assigned.

It's really -- when you look at this thing, it's the degree of the errors they made in the placement that really is the driving factor. And the change over between whether you want to argue the operational reclassification is really a secondary argument in this particular case.

* * *

I also want to, you know, go to the handouts. I have to show the comparison here of the way the employer reported to us and also to give you an idea of the degree of error that I'm talking about. And there's basically 10 pages here. I'm not going to go through each of the 10 pages in great detail, but I think it gives -- supports our position about the type of error and how great this error was.

On the first page, what I have here is a comparison of how the employer reported to Travelers, which is their outside -- their outside insured and to the BWC. Now, when you look at this, you'll see the department codes, those are the codes that are applicable to the state of Ohio, and you'll see that what I've done is I've either marked them as operational, which would be store-type people, or not operational, which would

be our administrative grouping, the clerical and the sales group.

If you look at this, you will see that the employer, you know, feeling also that if you consider that, you know, they operated in 48 states I believe we were told, that their stores in each state would be similar in how they would function, because the job descriptions are pretty much standard, you know, by, you know -- they're standard as far as didn't matter what state you were in, the duties would be pretty much the same. You can see how far off the difference is between what they gave Travelers as far as operational people versus what they gave Ohio. And it's very significant. You can see that it is a significant difference.

* * *

Okay. I now want to reference the second page, which I guess you can call item B. It's titled Aaron Rents error factor in reporting. Okay? You can see what we've done in this case, what I've done here is I've taken the found payroll in the audit versus what the employer reported in the year 2007, okay?

And basically what I'm showing here is that the employer presented in their reporting that approximately 76 percent of their payroll structure was clerical in nature. Whereas in reality if you look in the "found" column, the actual amount of clerical, and I included also in this the outside sales people which includes the traveling auditors and other administrative, non-operational employees, is in reality 6 percent.

And I don't care how you want to look at the numbers. You can look at it and you can see that they represented their clerical system in a little over $11 million in payroll when in reality was just a little over 816,000. That is what I refer to something as being a major error or major problem as far as reporting and is the grounds for saying, hey, look, you know, you just can't turn your back on this and say, hey, Mr. Employer, it's fine for you to, you know, miss -- to have misstated that amount of money and the Bureau not go back and try to recover the premium that should have been paid.

* * *

Page 8 is basically to give an indication of how the employer reported under Travelers. And the point I want to make on this is that if you look at the Ohio reporting where you have a 76 percent of the payroll structure being placed under clerical classification, if you look at any of the numbers, whether you want to start with Alabama, which is the first one, or you go down to something like Louisiana or -- or North Carolina, which are some of the bigger states.

* * *

All right. All I'm trying to point out here is look at the difference between the percentage that they put into nonclerical classifications, which we would say is 8742, 8803 or 8810 versus what they're giving Ohio. Example in Alabama you have $100,000 in those classifications over $5 million. You go down to North Carolina, you've got about a million against $10 million. So you're talking, you know, less than 10 percent in a lot of these cases or less than 1 percent. So that just shows you the degree of the placement errors that they had. And obviously they're used to working with the Travelers system or with NCCI that they would know the difference between a store type worker and that of an operational employee.

* * *

And basically what I've tried to do with this presentation today is to express the fact that we have an employer who, you know, I'm not accusing the employer of -- of anything, you know, that they deliberately did something wrong here, but when we audit an employer's account, you've got to look at the level of the errors that exist. You can't take a blind side to say, well, okay, he should have been 8017 rather than 8044, for that reason we make the whole audit prospective.

You've got to look at the whole picture here and that's the big point I'm making here, you've got to look at the fact that there are significant errors in the placements. Should they have known better? Well, maybe, maybe not. I mean, the issue for why they should know better is they have standard job descriptions and it says in them whether or not they have store duties or not.

You also have them using a national system who took the same job groupings they gave us and called them operational

> people, yet they wanted to present to Ohio that they were strictly clerical at a lower rate. This is basically our point.

(Tr. 58-66, 68-70, 72-73.)

{¶ 43} 24. Following the January 17, 2012 hearing, the administrator's designee mailed his decision and final order on August 9, 2012.  Relying in large part upon the testimony of Mr. Goellnitz, the administrator's designee determined that the audit shall be applied retrospectively under the 24-month provision of Ohio Adm.Code 4123-17-17(C).  The order explains:

> The Administrator's Designee adopts the statement of facts contained in the order of the Adjudicating Committee.
>
> Employer Position:
>
> The employer stated that in 2008, the Bureau reaudited the employer subsequent to the original audit which was not processed by the Bureau. The second audit assigned manual 8017 to the store personnel as well as other findings. The Bureau went back more than four years on the audit findings. After an Adjudicating Committee hearing, the audit was limited to a two year period of time. The Administrator's Designee then affirmed the decision. The employer filed a mandamus action and won in the Supreme Court. The Supreme Court's determination stated that the Bureau must explain its decision regarding the retrospective findings of the audit.
>
> The employer also stated the Adjudicating Committee hearing was improperly set for hearing before the Administrator's Designee. Original jurisdiction rests with the Adjudicating Committee not the Administrator's Designee. OAC 4123-14-06 states that the Administrator should refer matters to the Adjudicating Committee not the Administrator's Designee.
>
> Also, the product technicians were misclassified to manual 7380. These workers should be assigned to manual 8017. The other states in which the employer conducts business its technicians are under manual 8017.
>
> Additionally, the employer objects to the findings being applied retroactively. In 2006, the employer contacted the auditor and was told there were no problems with its audit.

The employer assumed that it was reporting properly since it was not made aware of the problems of the 2006 [sic] by the Bureau. It was not until 2008, that the employer found out there was a problem in the 2006 audit. The employer's premium payments were well above its claims costs so the employer did not believe the workers were improperly classified.

Finally, from 1992 to 2008, the employer was never given clear instructions as to how to report to the Bureau. The Bureau had a duty to instruct the employer back in 2006. That was not done. In a memo from Mr. Goellnitz to Mr. Glass, Mr. Goellnitz acknowledged that normally this would have been a prospective audit finding. Mr. Snyder was the auditor in 2006 and the Bureau made many of his prior audits prospective because of problem[s] with his audits.

Bureau's Position:

The final order of the Administrator's Designee was the final order of the Bureau. It was this order that was appealed to court. It was not the Adjudicating Committee order which was appealed to court. The Bureau did not need to conduct a formal hearing, it could have just explained its original order with regards to the prospective findings. The only issued [sic] remanded back from the court is the retrospective findings of the audit. The manual classification issue is not an issue to be decided at the hearing. The Bureau determined that the audit findings should be applied retroactively because this was a large employer who had third party representation. The employer['s] misuse of manual 8810 for store personnel was a gross mistake on the part of the employer. In cases like that the audit would not be made prospectively. The degree of the error was large. If only a couple of people were misreported to manual 8810 is a different situation than when most of operational payroll was placed in manual 8810. The payroll reported by the employer to Travelers Insurance was greatly different from than what was reported to the Bureau even though both used NCCI classifications. The clerical payroll (manual 8810) reported by the employer prior to the audit was 76% of payroll but after the audit it determined to be 6% of payroll. Manual 7380 is a standard exception classification. Manual 8017 does not specifically list drivers in the classification, so by NCCI rules the payroll must be reported to manual 7380.

Decision of the Administrator's Designee:

Based on the testimony at the hearing and the materials submitted with the protest, the Administrator's Designee orders that the audit findings of the Bureau be applied retroactively. Ohio Administrative Code 4123-17-17 (C) states "The bureau shall have the right at all times by its members, deputies, referees, traveling auditors, inspectors or assistants to inspect, examine or audit any or all books, records, papers, documents and payroll of private fund, county, or public employer taxing district employers for the purpose of verifying the correctness of reports made by employers of wage expenditures as required by law and rule 4123-17-14 of the Administrative Code. The bureau shall also have the right to make adjustments as to classifications, allocation of wage expenditures to classifications, amount of wage expenditures, premium rates or amount of premium. No adjustments, however, shall be made in an employer's account which result in reducing any amount of premium below the amount of contributions made by the employer to the fund for the periods involved, except in reference to adjustments for the semi-annual or adjustment periods ending within twenty-four months immediately prior to the beginning of the current payroll reporting period. Except as provided in rule 4123-17-28 of the Administrative Code, no adjustments shall be made in an employer's account which result in increasing any amount of premium above the amount of contributions made by the employer to the fund for the periods involved, except in reference to adjustments for the semi-annual or adjustment periods ending within twenty-four months immediately prior to the beginning of the current payroll reporting period. The twenty-four month period shall be determined by the date when such errors affecting the reports and the premium are brought to the attention of the bureau by an employer through written application for adjustment or from the date that the bureau provides written notice to the employer of the bureau's intent to inspect, examine, or audit the employer's records." The Administrator's Designee finds that the bureau has properly applied that rule and that the Employer misreported payroll for a period of at least twenty-four months immediately prior to the current payroll period. There was no demonstration that the bureau originally misclassified the Employer's operations or that the Employer relied on clear instructions previously provided to it by the bureau.

Moreover, the Administrator's Designee is persuaded by the testimony of the Bureau auditor and the arguments by the Bureau Counsel, Mr. Hartranft. The Bureau's auditor, Mr. Goellnitz, testified that when the employer was audited in 2008, BWC discovered that the employer had been improperly reporting operational employees as clerical employees. Mr. Goellnitz explained that this mis-classification resulted in the employer paying substantially less in premiums than it should have. He also testified about the magnitude of this misreporting. In 2007, the employer reported that approximately seventy-six percent of its payroll was clerical in nature and twenty-four percent worked in an operational capacity. In fact, the audit revealed that only six percent of the employer's payroll was clerical in nature and the remaining ninety-four percent should have been reported as operational.

Alarmingly, the audit revealed that the employer was reporting a very different distribution of employees to insurers in other states, even though both the Bureau and the outside insurers use the same classification system. One would expect that the same job classification should be reported to both the Bureau and to the outside insurers as part of the operational manual. In fact, a comparison of employee classifications in the other 48 states in which the employer operated showed that they [sic] way the employer reported its Ohio payroll was completely out of line with the rest of its operations. In Ohio, the employer reported 76 percent of its pay as clerical. In other states the percentage was 10% or less. Mr. Goellnitz concluded that because of the scope of the reporting discrepancies, and the fact that the inaccurate reporting resulted in a large underpayment of premiums, it would have been inappropriate to allow the employer to benefit from its inaccurate reporting of payroll. Accordingly, the Bureau exercised the discretion granted under O.A.C. 4123-17-17(C) and applied the reclassification retroactively.

Additionally, this hearing dated January 17, 2012, was not a de novo hearing given the decision of the Supreme Court of Ohio and was, therefore, properly before the Administrator's Designee. The Administrator's Designee did issue an order in this matter. The Designee's order not only adopted the Adjudicating Committee's statement of facts, but also affirmed "the Adjudicating Committee's findings, decision, and rationale set forth in the order."

{¶ 44} 25. On March 1, 2013, relator, Aaron's, Inc., filed this mandamus action.

Conclusions of Law:

{¶ 45} The January 17, 2012 order of the administrator's designee relies in large part upon the testimony of auditor Goellnitz in denying Aaron's request for prospective application only of the audit findings. Pointing to the "magnitude of [the] misreporting" and the "scope of the reporting discrepancies" that resulted "in a large underpayment of premiums," the administrator's designee found it "inappropriate to allow the employer to benefit from its inaccurate reporting of payroll." On that basis, as more fully explained in his order, the administrator's designee exercised his discretion under Ohio Adm.Code 4123-17-17(C) to apply the reclassifications retrospectively.

{¶ 46} The main issue is whether the administrator's designee abused the discretion granted to him under Ohio Adm.Code 4123-17-17(C) to apply the reclassifications retrospectively.

{¶ 47} Ohio Adm.Code 4123-17-17(C) currently provides:

> The bureau shall have the right at all times by its members, deputies, referees, traveling auditors, inspectors or assistants to inspect, examine or audit any or all books, records, papers, documents and payroll of private fund, county, or public employer taxing district employers for the purpose of verifying the correctness of reports made by employers of wage expenditures as required by law and rule 4123-17-14 of the Administrative Code. The bureau shall also have the right to make adjustments as to classifications, allocation of wage expenditures to classifications, amount of wage expenditures, premium rates or amount of premium. No adjustments, however, shall be made in an employer's account which result in reducing any amount of premium below the amount of contributions made by the employer to the fund for the periods involved, except in reference to adjustments for the semi-annual or adjustment periods ending within twenty-four months immediately prior to the beginning of the current payroll reporting period. Except as provided in rule 4123-17-28 of the Administrative Code, no adjustments shall be made in an employer's account which result in increasing any amount of premium above the amount of contributions made by the employer to the fund for the periods involved, except in reference to adjustments for the semi-annual or adjustment periods ending within twenty-four months immediately prior to the beginning of

the current payroll reporting period. The twenty-four month period shall be determined by the date when such errors affecting the reports and the premium are brought to the attention of the bureau by an employer through written application for adjustment or from the date that the bureau provides written notice to the employer of the bureau's intent to inspect, examine, or audit the employer's records.

{¶ 48} Analysis begins with the observation that the January 17, 2012 order of the administrator's designee does not find that Aaron's intentionally misreported its payroll. In fact, Goellnitz was careful not to allege intentional misreporting, as he stated at the hearing: "Should they have known better? Well, maybe, maybe not." (Tr. 73.)

{¶ 49} That is not to say that intentional misreporting was never suggested. The administrator's designee, like any fact-finder in any administrative, civil or criminal proceeding, may draw reasonable inferences and rely upon his own common sense in evaluating the evidence. *See State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.*, 98 Ohio St.3d 134, 2002-Ohio-7089. The administrator's designee chose not to draw inferences from the testimony or other evidence of record that might arguably support a finding of intentional wrongdoing. Clearly, the decision of the administrator is not based upon a finding of intentional misreporting. Rather, his decision to apply the reclassifications retrospectively is based upon the "magnitude" of the error.

{¶ 50} The analysis of the order of the administrator's designee is important because relator seems to suggest here that the bureau cannot apply the reclassification retrospectively because any allegation of impropriety was held to be "unfounded" following an investigation by the bureau's special investigation department. In a report of investigation dated December 30, 2008, the special agents of the bureau concluded "there is currently no evidence to support that Aaron Rents had knowledge of or intentionally misreported payroll." Consequently, the report indicates that the investigation is closed and that the allegations are "unfounded."

{¶ 51} Also, as Aaron's points out here, an October 28, 2008 entry on the Bureau's Fraud Management System states:

On October 28, 2008, [special agent] Mergen reviewed the case on Aaron Rents and recommends the case be closed unfounded for EOM October 2008.

> The case was initiated through an allegation which alleged Aaron Rents was improperly reporting a substantial amount of its payroll incorrectly as clerical.
>
> Records have been obtained from the private insurance carrier and from monopolistic states regarding Aaron Rents' workers compensation coverage. The records do indicate that Aaron was reporting a significantly higher percentage of clerical payroll in Ohio. However, to date there is no evidence to support that Aaron Rents knew that they were reporting incorrectly to the BWC.

{¶ 52} While the bureau's investigation cleared Aaron's of the allegations of intentional wrongdoing, that is not dispositive of this court's review of the order of the administrator's designee.

{¶ 53} Relator cites to no case or authority that holds that retrospective billing can only be premised upon the intentional wrongdoing of the employer, *State ex rel. Roberds, Inc. v. Conrad,* 86 Ohio St.3d 221 (1999), strongly suggests otherwise.

{¶ 54} In *Roberds*, a bureau audit revealed that the employer, Roberds, Inc., had misclassified some of its employees and, as a result, underpaid its premiums by over one million dollars. The main issue in *Roberds* was over the length of the period over which recovery was permissible. Roberds, Inc. argued that the bureau was limited to a one-year recovery period under Ohio Adm.Code 4123-17-28 and that the bureau could not recover under the 24-month back period under Ohio Adm.Code 4123-17-17(C).

{¶ 55} In *Roberds*, the court held that the bureau could recover under Ohio Adm.Code 4123-17-17(C). Again, there was no direct discussion by the court regarding intentional wrongdoing. However, the *Roberds* court did state:

> The employer's submission of premium and payroll data to the bureau is essentially on an honor system. Unless an audit of the employer's records reveals otherwise, the bureau presumes that the employer has correctly reported its premiums. In this case, the audit revealed that Roberds had misclassified some of its employees.

*Id.* 222.

{¶ 56} Thus, in *Roberds*, that the employer had misclassified some of its employees was sufficient for the bureau to recover under the 24-month provision of Ohio Adm.Code 4123-17-17(C).    There is nothing in *Roberds* to indicate that the employer's misclassification was intentional.

{¶ 57} Given the above analysis, the issue here becomes whether the magnitude of Aaron's misclassification is a sufficient basis for the bureau to deny the request that the misclassification be applied prospectively only.  This magistrate can see no reason why magnitude cannot be a basis for the bureau's decision.

{¶ 58} Another issue must be addressed.  Relator contends that the bureau erred or abused its discretion by failing on the remand to first schedule a hearing before the adjudicating committee, rather than the administrator's designee.  The magistrate disagrees.

{¶ 59} Analysis begins with a review of the July 5, 2011 judgment entry of the Supreme Court of Ohio which was filed in this court on July 25, 2011.  The judgment entry states:

> This cause, here on appeal from the Court of Appeals for Franklin County, was considered in the manner prescribed by law. On consideration thereof, the judgment of the court of appeals is reversed, and a limited writ is issued that returns this cause to the Ohio Bureau of Workers' Compensation for further consideration and for an amended order that includes an explanation for its decision, consistent with the opinion rendered herein.
>
> It is further ordered that a mandate be sent to the Court of Appeals for Franklin County by certifying a copy of this judgment entry and filing it with the Clerk of the Court of Appeals for Franklin County.

{¶ 60} Clearly, the judgment entry does not indicate that the bureau must schedule a hearing before the adjudicating committee.

{¶ 61} Ohio Adm.Code 4123-14-06 is a bureau rule captioned "Bureau of workers' compensation adjudicating committee."  Thereunder, the bureau rule provides:

> (A) The administrator of the bureau of workers' compensation may delegate the authority granted to the administrator under Chapters 4121., 4123., and 4131. of the

Revised Code and agency 4123 of the Administrative Code for determining employer premium, assessment, or penalty obligations or liabilities, eligibility for alternative premium plans or discount programs, or other employer-related disputes or issues as may be authorized under the workers' compensation statutes and rules. For this purpose, the administrator may appoint an adjudicating committee to provide employers with hearings on such matters referred to the committee.

* * *

(E) The committee shall keep a record of its dockets and proceedings. The committee's decisions shall be reduced to writing and mailed forthwith to all interested parties and shall state the evidence upon which the decision was based and the reasons for the committee's actions. The decision of the committee shall be the decision of the administrator. If the employer files a written appeal within thirty days of the employer's receipt of the committee's decision, the administrator or the administrator's designee shall hear the appeal of the decision of the committee, and shall conduct a hearing for such purpose.

{¶ 62} Citing Ohio Adm.Code 4123-14-06(A) and (E), relator points out that the adjudicating committee hears an employer's protest first. The administrator's designee will hear an appeal from the adjudicating committee if an appeal is timely filed by the employer.

{¶ 63} According to relator, the "plain language" of the bureau rule "proscribes the order of events, with no exception for cases that are returned from a reviewing court." (Relator's brief, 21-22.) Thus, based upon the rule's absence of direction for compliance with a court issued writ, relator concludes that the rule proscribes a hearing before the adjudicating committee for compliance with the instant writ. Relator's argument lacks merit. Because the bureau rule does not address compliance with a writ of mandamus, it cannot be interpreted to require an adjudicating committee hearing as a necessary first step toward compliance with the writ. In short, relator's reliance upon the bureau rule is misplaced.

{¶ 64} Relator's argument continues with its observation that the February 10, 2009 order of the administrator's designee adopted the September 24, 2008 decision of the adjudicating committee without much explanation and thus, as relator argues, it was the September 24, 2008 decision of the adjudicating committee that actually provided the courts with a reviewable order. As relator puts it, "[a]nything of substance upon which the Supreme Court based its decision to order a limited writ had to be based upon a review of the Adjudicating Committee order." (Relator's brief, 20.)

{¶ 65} Even if relator's observation regarding the two prior orders is correct, it does not follow that compliance with the writ must begin with another hearing before an adjudicating committee. In fact, the proceedings before the administrator's designee on January 17, 2012 shows the fallacy of relator's argument. That is, the administrator's designee took extensive recorded testimony with oral arguments from counsel, and then issued a lengthy, written decision that is under review here.

{¶ 66} Relator nonetheless argues:

> Moreover, because that September 24, 2008 Adjudicating Committee hearing was not a record hearing, there was no official record of the proceedings available to be referenced upon which the Administrator's Designee could provide an amended order.

(Relator's brief, 20.)

{¶ 67} The parties were free to present testimony and evidence on January 17, 2012 before the administrator's designee. There was no need for a record hearing before another adjudicating committee to serve as an evidentiary basis for a presumed appeal to the administrator's designee.

{¶ 68} Moreover, as respondent correctly points out here, it was the February 10, 2009 order of the administrator's designee that was the final order that needed correction. It was the February 10, 2009 order of the administrator's designee that had to be vacated for compliance with the writ. It is irrelevant that it might be argued that the adjudicating committee had issued a more comprehensive order than did the administrator's designee of February 10, 2009.

{¶ 69} Based upon the above arguments, the magistrate concludes that the bureau did not err or abuse its discretion in refusing relator's request for an adjudicating committee hearing for compliance with the writ.

{¶ 70} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.


/S/ MAGISTRATE
KENNETH W. MACKE


**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).