[Cite as *State ex rel. NHVS Internatl., Inc. v. Ohio Bur. of Workers' Comp.*, 2014-Ohio-5522.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio, ex rel.                             :
NHVS International, Inc.

                                               :

     Relator,                            :            No.  13AP-356

v.                                                 :            (REGULAR CALENDAR)

                                               :

Ohio Bureau of Workers'
Compensation,                                      :

     Respondent.                         :

---

D E C I S I O N

Rendered on December 16, 2014

---

*Finley & Co., L.P.A., David G. Finley* and *Patrick M. Higgins,* for relator.

*Michael DeWine*, Attorney General, and *Kevin J. Reis*, for respondent.

---

IN MANDAMUS
ON OBJECTION TO THE MAGISTRATE'S DECISION

DORRIAN, J.

{¶ 1} Relator, NHVS International, Inc. ("relator"), filed this original action requesting a writ of mandamus ordering respondent, Ohio Bureau of Workers' Compensation ("BWC"), to vacate the order of the BWC administrator's designee denying relator's protest of the decision to reclassify certain employees and to apply the reclassification retrospectively. Relator further requests a writ of mandamus ordering BWC to assign a different classification as its primary classification, to assign more than one basic code to relator's business, and to apply any and all classification changes prospectively from the date of the writ.

{¶ 2} Pursuant to Civ.R. 53(D) and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate recommends that this court grant a limited writ of mandamus ordering BWC to vacate the portion of the order of the administrator's designee determining that the reclassification would be applied retrospectively and ordering BWC to enter an amended order adjudicating relator's protest.

{¶ 3} BWC sets forth one objection to the magistrate's decision:

> The Magistrate erred in finding that the Administrator's Designee abused his discretion as the Designee had some evidence to support the retrospective application of the audit findings.

{¶ 4} As explained in the magistrate's decision, this case arises from BWC's reclassification of the basic manual code applied to relator's employees pursuant to an audit conducted by BWC, the decision of BWC to apply the reclassification retrospectively, and the corresponding increase in workers' compensation insurance premiums resulting from the reclassification. Relator protested the audit findings that resulted in the reclassification and retrospective application of the reclassification. A three-member adjudicating committee of BWC denied relator's protest. Following an appeal by relator and a hearing, the BWC administrator's designee issued an order affirming the order of the adjudicating committee and denying relator's protest.

{¶ 5} In his decision, the magistrate concluded that the BWC administrator's designee did not abuse his discretion in determining the appropriate basic classification to be applied to relator's employees or in determining that relator failed to show that it should be assigned more than one basic classification. The magistrate concluded, however, that the administrator's designee abused his discretion in determining that the audit findings were to be applied retrospectively. The magistrate cited an audit protest policy discussed in the decision of the administrator's designee. That policy provides that, if a protest is based on the retroactive assignment of a higher rate classification and the misclassification was due to an error by BWC, then the revised classification should be applied prospectively and the audit should be revised. The magistrate concluded that BWC initially misclassified relator's operations and that the portion of the order of the

administrator's designee concluding that the audit findings should be applied retrospectively was significantly flawed. Based on this conclusion, the magistrate recommended that this court issue a writ of mandamus ordering BWC to vacate the portion of the order determining that the audit findings would be applied retrospectively and enter an amended order adjudicating relator's protest. BWC objects to this conclusion and asserts that the magistrate erred by concluding that the administrator's designee abused his discretion.

{¶ 6}   BWC argues that the magistrate cited to no clear legal right of relator to prospective application and no clear legal duty of the administrator to grant such application.   "Mandamus is an extraordinary writ that must be granted with caution." *State ex rel. Liberty Mills, Inc. v. Locker*, 22 Ohio St.3d 102, 103 (1986). To obtain a writ of mandamus, a relator must demonstrate (1) that he or she has a clear legal right to the relief requested; (2) that the respondent has a clear legal duty to grant the relief requested; and (3) that he or she has no adequate remedy in the ordinary course of law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28, 29. "It is axiomatic that in mandamus, the legal duty must be the creation of the legislative branch, and courts are not authorized to create the legal duty enforceable in mandamus." *State ex rel. Byrd v. Ross*, 10th Dist. No. 03AP-478, 2004-Ohio-2642, ¶ 14. The right to mandamus must be shown by clear and convincing evidence, and a writ will not be granted in doubtful cases. *State ex rel. Goldsberry v. Weir*, 60 Ohio App.2d 149, 153 (10th Dist.1978).

{¶ 7}   In his decision, the magistrate cites the decision of the Supreme Court of Ohio in *State ex rel. Aaron Rents, Inc. v. Ohio Bur. of Workers' Comp.*, 129 Ohio St.3d 130, 2011-Ohio-3140 *("Aaron Rents")*. In *Aaron Rents*, BWC applied a reclassification retroactively following an audit. *Id.* at ¶ 5. The Supreme Court concluded that BWC failed to explain why it applied the reclassification retroactively and that an explanation was required to permit both the employer and a reviewing court to determine whether BWC abused its discretion in making the retroactive reclassification. *Id.* at ¶ 12. The Supreme Court granted a limited writ of mandamus ordering BWC to vacate its order, further consider the matter, and issue an amended order including an explanation for its decision. *Id.* at ¶ 13.

{¶ 8} After the magistrate entered his order in the present case, this court decided a mandamus action filed following BWC's entry of an amended order pursuant to the *Aaron Rents* decision. *State ex rel. Aaron's, Inc. v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 13AP-170, 2014-Ohio-3425 *("Aaron's")*. In that action, the employer referred to an internal BWC policy providing that reclassifications would be applied prospectively unless there was some fault on the part of the employer. *Id.* at ¶ 7. Although the policy was not identified or produced in *Aaron's*, it appears to be similar to the policy referred to in the present case. In ruling on the mandamus claim, this court "reject[ed] [the] argument that the internal policy to 'go prospective on an audit' establishes a clear legal duty on the part of the [BWC], or a clear legal right on the part of the relator, to apply the reclassification prospectively."[1] *Id.* at ¶ 9.

{¶ 9} Notwithstanding our conclusion that an internal policy does not create a clear legal duty or clear legal right, we are mindful of the Supreme Court's instruction in *Aaron Rents*[2] that the BWC shall provide an explanation for retroactive reclassification so that the court can determine if such reclassification was an abuse of discretion. In *Aaron's*, the BWC asserted "magnitude of misclassification" as the basis for retroactive reclassification. The employer requested a writ to vacate the order and to prospectively apply the reclassifications, asserting that "the [bureau's] own internal policy is to 'go prospective on an audit' unless there is some intentional wrong-doing or disregard on the part of the employer." *Aaron's* at ¶ 4. We found magnitude of misclassification to be a sufficient basis to deny prospective reclassification and, as noted above, rejected the employer's argument that the internal policy established a clear legal duty or right to apply reclassification prospectively. *Aaron's* at ¶ 9. The facts in *Aaron's* are quite different from the facts in the case before us. In this case, the only explanation provided by the administrator's designee for retroactive reclassification was the application of Ohio Adm.Code 4123-17-17(C) "in accordance with the * * * written policy." The

---

[1] As the magistrate notes, it appears that the policy at issue here, and the requirement that audit results will only be applied prospectively where BWC made an error, has not been promulgated through the rulemaking process and codified in the Ohio Administrative Code. The audit-protest policy appears to have been adopted in 2008 and revised in 2011. Although the policy cross-references the Ohio Administrative Code, the process by which it was created, adopted, and revised is unclear. By contrast, the provision limiting BWC's authority to make retroactive adjustments to the 24 months prior to the current reporting period is codified in the Ohio Administrative Code. *See* Ohio Adm.Code 4123-17-17(C).

[2] We note that, in *Aaron Rents*, the Supreme Court did not discuss the criteria for granting mandamus.

administrator's designee concluded in a March 19, 2013 order that such application of the written policy was proper because "[t]here was no demonstration that the bureau originally misclassified the Employer's operations." Relator requested a writ to vacate the order, asserting that this factual conclusion of the administrator's designee was incorrect. Relator does not argue that the written policy established a clear legal right and clear legal duty. In essence, relator argues that, if the policy is to be applied, it should be applied to correct facts.

{¶ 10} For the reasons outlined in the magistrate's decision, we agree. We conclude that the administrator's designee abused his discretion in concluding that "there was no demonstration that the bureau originally misclassified the Employer's operations," and abused his discretion by applying the reclassification retroactively on the basis of that incorrect factual conclusion and pursuant to the written policy. No other explanation was provided for retroactive reclassification. Accordingly, BWC's objection is overruled.

{¶ 11} Following an independent review of the record, we find that the magistrate has properly determined the pertinent facts and applied the appropriate law. Accordingly, we adopt the magistrate's decision as our own. We issue a limited writ of mandamus ordering BWC to vacate that portion of the order of its administrator's designee that determined the audit findings shall be applied retrospectively and, in a manner consistent with this magistrate's decision, to enter an amended order that adjudicate's relator's protest.

*Objection overruled; limited writ granted.*

TYACK and KLATT, JJ., concur.

_____

# APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, ex rel. NHVS International, Inc. | : | |
| | : | |
| Relator, | | No. 13AP-356 |
| | : | |
| v. | | (REGULAR CALENDAR) |
| | : | |
| Ohio Bureau of Workers' Compensation, | : | |
| | : | |
| Respondent. | : | |

---

## MAGISTRATE'S DECISION

### Rendered on May 30, 2014

---

*Finley & Co., L.P.A., David G. Finley* and *Patrick M. Higgins,* for relator.

*Michael DeWine*, Attorney General, and *Kevin J. Reis*, for respondent.

---

### IN MANDAMUS

{¶ 12} In this original action, relator, NHVS International, Inc. ("relator" or "NHVS"), requests a writ of mandamus ordering respondent, Ohio Bureau of Workers' Compensation ("bureau"), to vacate the March 19, 2013 order of the administrator's designee that denied relator's protest of the bureau's assignment to relator of manual code 3372 as its basic manual code, and to enter an order assigning to relator manual code 4692 as its basic manual code. Should this court uphold the bureau's assignment to relator of manual code 3372 as its basic manual code, relator requests that the writ order the bureau to hold relator accountable on a prospective only basis.

<u>Findings of Fact</u>:

{¶ 13}  1.  NHVS is an Ohio corporation that was incorporated June 1, 2010.

{¶ 14}  2.  On July 1, 2011, NHVS started its business in Ohio from a location in Mentor, Ohio.

{¶ 15}  3.  On or about September 13, 2011, Sherry Richcreek, NHVS's executive director, completed for relator an application for Ohio Workers' Compensation Coverage on bureau form U-3.

{¶ 16}  4.  The U-3 form instructs the applicant:

Describe your services or products, including your methods of operations. Include raw and semi-finished materials used (attach additional documentation, if necessary). Note: It is important for you to provide as much information as possible for BWC to properly determine your correct classification.

{¶ 17}  In response, Richcreek stated:

Light manufacturing Service. Finish cores, prep cores, assemble wax, wax injection, and metal finishing.

{¶ 18}  The U-3 form requested additional information:

Describe machinery, equipment and tools (attach additional documentation, if necessary).

{¶ 19}  In response, Richcreek wrote:

Wax injectors, small wax pots, belters, sanders, and hand drills.

{¶ 20}  5.  By letter dated October 31, 2011, the bureau thanked relator for "establishing Ohio workers' compensation coverage."

{¶ 21}  6.  The bureau provides a form captioned "payroll report" that the employer must complete to maintain its coverage.  The first payroll report received by relator indicated that relator must report its payroll for the period September 13 through December 31, 2011.  The payroll report indicated that the completed report and the premium payment must be received by the bureau by February 29, 2012 to prevent a lapse in coverage and other penalties.

{¶ 22} The payroll report form provides spaces for the employer to report the number of covered workers and corresponding payroll for the applicable National Council on Compensation Insurance ("NCCI") manual codes. On the payroll form received by relator, "3336RN Type Foundry" was printed by the bureau on the form. In response, Richcreek entered a zero for the number of covered workers and another zero for the corresponding payroll.

{¶ 23} However, in her own hand, Richcreek entered manual code "8810" and that 246 workers are covered under that manual code for a total payroll $3,057,693.

{¶ 24} Also, Richcreek indicated that NHVS employs 70 "Metal Finishers" for a payroll of $1,846,379. Applying the rates applicable to those employed under "8810" and as "Metal Finishers," Richcreek calculated the premium to be $10,735. On a check dated February 29, 2012, Richcreek made payment to the bureau in the amount of $10,735.

{¶ 25} 7. By letter dated July 18, 2012, Michael B. Glass, the bureau's director of underwriting and premium audit ("director Glass") informed relator that manual 8810 with a "Class description" for "Clerical Office Employees Noc" was "activated" effective January 1, 2012. The letter explained that, "BWC has received additional information regarding your policy." However, the letter did not identify the additional information. The letter concluded with the instruction: "Please report payroll for operations described by the code(s) * * * with your next payroll report."

{¶ 26} 8. On Tuesday July 24, 2012, at 4:18 p.m., John Best sent an e-mail to Richcreek:

> Chris contacted BWC pertaining to the assigned NCCI classification 3336, which includes casting using wax and is exactly what your application for coverage says you do.

{¶ 27} 9. On Wednesday July 25, 2012, at 10:30 a.m., Richcreek e-mailed to Best:

> Hello John
>
> We do not manufacture anything we provide a service to the foundry which is polishing castings that are delivered to us. We add pieces to wax pieces that are made by our customers and are brought here. We do not manufacture nor have we ever even had a furnace to melt metal. I need to know how to appeal this as you have been at our facility and this is wrong.

{¶ 28} 10.  On Wednesday July 25, 2012, at 10:54 a.m., Best e-mailed to Richcreek:

Hello Sherry,

Based on your business description below, the code should be 3372 for finishing of castings. Below is the Scope as published by NCCI. The part is [sic] green is the reference to finishing of castings. Are you ok with this as your business operations code?

{¶ 29} 11.  On Wednesday July 25, 2012, at 11:45 a.m., Richcreek e-mailed to Best:

Hello John,

We only remove small amounts excess metals from castings provided by our customer, they are polished and or sandblasted and returned to the customer. We do no chemical process at all. Most of our work is bench work with hand files or very small drills, used on ceramic and wax pieces taking dye lines down, adding plastic/wax pieces, everything (including the wax pattern) is supplied by our customer. The metal department is only about 35% of our business.

{¶ 30} 12.  On Wednesday July 25, 2012, at 12:00 p.m., Best e-mailed to Richcreek:

Ok, I do understand. While your business may not do everything indicated by the code Scope published by NCCI, 3372 is the Code to be assigned to your business and your business will be in the low degree of hazard or exposure within that particular code.

{¶ 31} 13. By letter dated July 25, 2012, director Glass informed relator that manual 3372 with a "Class description" for "Electroplating" was being "activated" effective September 13, 2011.  The letter also informed relator that manual 8810 was being "activated" effective September 13, 2011.  The letter further informed relator that manual 3336 with a "Class description" for "Type Foundry" has been "deactivated" effective January 1 and July 1, 2012.

{¶ 32} 14. The second payroll report that relator received from the bureau indicated that relator must report its payroll for the period January 1 through June 30, 2012.  The payroll report indicated that the completed report and premium payment must be received by the bureau by August 31, 2012.

{¶ 33} On the second payroll report, as with the first payroll report, "3336RN Type Foundry" was printed for relator on the form. Richcreek did not enter requested information regarding "3336RN Type Foundry." Rather, in her own hand, Richcreek entered "8810RN Clerical" under "NCCI Manual Description."

{¶ 34} On the second payroll report, Richcreek indicated that relator employs 442 workers covered under manual 8810 based upon payroll of $5,126,092. Richcreek calculated her premium for the first half of calendar year 2012 to be $11,221.01.

{¶ 35} By check dated July 23, 2012, Richcreek made payment to the bureau in the amount of $11,221.01.

{¶ 36} 15. On August 28, 2012, bureau auditor Ed Grau conducted an onsite audit of NHVS's business records. Under "Description of Findings," Grau reported:

> Reviewed employer's records from 7/1/11 to 6/30/12. There were findings for all periods reviewed. Audit found that the employer's BWC coverage began 9/13/11, however, the employer's payroll began 7/1/11. Audit added a prior to coverage period from 7/1/11 to 9/12/11. The employer had reported payroll from this period to the 9/13/11-12/31/11 period. Audit moved the appropriate payroll to the prior to coverage period.
>
> For all periods reviewed, audit will move payroll of operational employees previously reported to NCCI manual 8810 (clerical) to NCCI manual 3372 (electroplating). Payroll of employees with clerical only duties will remain classified to NCCI manual 8810.

{¶ 37} 16. On September 7, 2012, relator's third-party administrator ("Sheakley"), notified the bureau that relator is protesting the audit findings.

{¶ 38} 17. By letter dated September 21, 2012, Michael Kennedy, a regional supervisor of the bureau's underwriting and premium audit department, responded to the September 7, 2012 protest. Mr. Kennedy stated:

> The complaint received via e-mail dated September 7, 2012 disagreeing with the reclassification of operational employees of NHVS from NCCI manual 8810 Clerical Office Employees NOC to NCCI manual 3372 Electroplating has undergone a departmental review. The review has confirmed that the change in classification was correct.

Ohio Administrate Code section 4123-17-08 as well as section 4123.29 of the Revised Code provides that the BWC must conform to the classification of industries according to the categories established by the National Council on Compensation Insurance (NCCI).

NCCI manual 3372 "is applicable to metal finishing operations such as polishing and buffing small miscellaneous articles of metal, plastic, etc...Metal deburring operations are classified to Code 3372. This operation involves the removal of rough edges or areas from metal goods. Shot peening of metal parts is assigned to 3372 by analogy." The audit established that the employer's operations are consistent with code 3372.

The use of manual 8810 Clerical is governed by Ohio Administrative Code 4123-17-09 which clearly outlines that this manual shall include only the payroll of those individuals whose duties are confined to keeping the books and records of the employer, conducting correspondence and drafting or who are engaged wholly in office work where such books are kept, having no duties of any nature in or about the risk's premises.

The audit reclassified employees to code 3372 whose duties included operational duties or supervisory duties outside of an office environment.

You may appeal BWC's decision pursuant to Ohio Revised Code Section 41223.291 [sic] and Ohio Administrative Code section 4123-14-06. I have attached a form legal 15 which you will need to file if you desire to have this matter heard before the Adjudication Committee.

{¶ 39} 18. By letter dated September 21, 2012, Terrie Weiland, a Sheakley rate analyst, wrote as follows to the bureau:

Our client mentioned above has recently been notified of an outstanding balance due to the Bureau of Workers' Compensation. This balance due is a result of an audit which was conducted in June 2011. Based on the unusual circumstances surrounding this matter, we are protesting the audit findings. We would like to request a phone hearing to resolve this issue.

Originally, Dr. Sherry Richcreek worked for her husband for many years. Dr. Richcreek had begun developing her

company NHVS International Inc. in 2010, she had it incorporated and started working on new customers for the entity. During this time her husband became ill with cancer and was going to downsize because of his health, so her company purchased part of the assets. NHVS International Inc. submitted paperwork by computer on May 24 of 2011 for a July 1st start date.

Ed Grau a BWC Auditor called stating he would be out on June 4th for an audit due to them being a split from a company that is still in business. The audit was completed, however no audit findings were ever sent to the employer advising them of the outcome.

When she received their first payroll report it reflected manual codes 8810 and manual code 3336 which is a Foundry code. She was very surprised since they are not a manufacture[r] and made multiple phone calls to the bureau to find out why it was added. She was told that since 30 of their employees do metal polishing she must report all of her employees under 3336 manual code. She ultimately reported and paid her premiums of $10,735 using the 8810 & 3336 manual codes.

August 14, 2012 NHVS International received an invoice for $79,684.42, unbeknown to them; Ed Grau had changed their manual code from 3336 to 3372 which resulted in the outstanding balance. No audit findings were ever sent to the employer informing them of this change from the audit that was completed back in June of 2011. Up to this point they thought the were in good standings with the bureau, since it had been 10 months since the audit they had no reason to think there was an issue.

Based on NHVS International business operations we feel that manual code 3336 and 3372 are inappropriate codes to have to report all operational personnel under. They have between 400-600 employees working and their highest revenue brought into the business is from small bench assembly and only 35% of their workforce actually doing the metal polishing. They are not disputing the fact that the 30 employees that are doing the metal polishing should be reported under manual code 3372. However, the other 200 employees that are assembling product should not have to be reported under a manufacturing metal code.  They want to report correctly, and feel they should be assigned appropriate manual codes that best reflect the job duties

performed by their employees. We feel that the employer should be allowed to segregate their payroll according to the job duty performed.

NHVS International currently has around $2,082 in total claim costs which includes the 2012 claims. If the manual codes that are assigned remains they could be paying up to $400,000 a year in premiums. This would cause a financial hardship on them and could impact whether or not they could remain in business.

In closing we are asking that you add additional manual codes under NHVS International and allow them to report payroll under the manual code that best fits their employee's job duty. We ask that they not be required to report their small bench assemblers under a Metal Manufacturing code due to the ratio of employees verse job performed. We also ask that you take into consideration their main form of revenue is not by the metal polishing but from the small bench assembly.

{¶ 40} 19. By letter dated October 2, 2012, director Glass informed relator that manual 3372 regarding "Electroplating" and manual 8810 regarding "Clerical Office Employees Noc" are being activated effective July 1, 2011.  (Compare with Director Glass' letter dated July 25, 2012.)

{¶ 41} 20. On October 2, 2012, the bureau issued to relator an invoice indicating that $426, 525.51 is due to be paid by October 30, 2012.

{¶ 42} 21. On November 8, 2012, bureau auditor Harry Yoder conducted a rating inspection.  In his report, under "Nature of the operation," Yoder wrote:

Deburring and polishing of customers' metal and plastic parts.

{¶ 43} Under "Method of operation in detail," Yoder wrote:

The customers' parts are small automobile parts, and the customers need their parts deburred and polished with the use [of] grinding machines, CNC machines, and hand polishing equipment. The company's employees debur and polish the customers' parts. The parts are metal and plastic. The deburring and polishing of the plastic parts also involve applying hot wax to some of the parts[.] [E]mployees use a prep pad that they dip into the wax to apply the wax to the parts. The wax is used to fill cracks and complete add

substance to the parts. After the parts are deburred and polished, the parts are parts are [sic] shipped to the customers. The prep pad that was mentioned above for applying the wax onto the plastic parts are assembled in a separate area of of [sic] the company's buil[d]ing. The employees in the prep pad department manufacture the prep pads by taking scotch brite material and gluing the scotch brite to the ends of popsicle sticks[.] The scotch brite comes in rolls, and the employees cut the scotch brite into small pieces. The small pieces are glued to the ends of the popsicle sticks to form the prep pads. The prep pads are used by the employees in the deburring and polishing of the customers' parts, and prep pads are sold to customers for use in their business. The reason for explaining the prep pad process is due to the fact that the prep pad business and deburring/polishing business were combined by Columbus Central Office, because both businesses are located at the same address, and the prep pad business realizes most of its business on the deburring/polishing business both businesses file separate tax returns. The deburring business filesl an 1120, and the prep pad business files an 990. There are no intermingling of employees between the two businesses, and Dr. Sherry Richcreek is the president of the deburing business with the name of NHVS International Inc[.], and James Richcreek is the president of the prep pad business with the name listed above.

{¶ 44} In his report, Yoder concluded:

Manual 3372 is considered correct for the deburring and polishing of the customers' parts.

{¶ 45} 22. On December 4, 2012, Paul A. Watson, secretary to the bureau's adjudicating committee, issued a document captioned "Statement of Protest," which states:

**Background Facts and Issues Presented:** The Bureau audited the employer, for the period from July 1, 2010 to June 30, 2012. The auditor found that the employer should have reported its operational employees under its main operational manual. Instead, the employer had reported the payroll to Codes 8810 (Clerical Officers).

The employer protested the finding and requested a hearing before the Adjudicating Committee.

{¶ 46} 23. On December 12, 2012, the bureau's three-member adjudicating committee heard relator's protest. On December 27, 2012, the adjudicating committee mailed an order denying relator's protest. The order explains:

> **Background Facts and Issues Presented:** The Bureau audited the employer, for the period from July 1, 2011 to June 30, 2012. The auditor found that the employer should have reported its operational employees under its main operational manual. Instead, the employer had reported the payroll to Code 8810 (Clerical Officers).
>
> The employer protested the finding and requested a hearing before the Adjudicating Committee.
>
> \* \* \*
>
> **Employer's Position:**
>
> The employer was given confusing information from the Bureau regarding the manual classifications. The Bureau never informed the employer of the audit findings. The employer was assigned two manufacturing codes (m3336 and m3372). The employer only has a few manufacturing employees. However, the Bureau classified almost all workers as operational employees. Most workers are not engaged in metal polishing or grinding. The claims history of this employer shows they run a safe operation. Only 30-50 workers do metal polishing. The employer cannot afford to pay the higher rates. Manual 3632 might be a more appropriate manual classification. There are also other classifications that might be more appropriate.
>
> **Bureau's Position:**
>
> The employer was originally assigned manual 3336. Later manual 8810 was added. The employer reported almost its entire payroll to manual 8810. In July 2012, the Bureau's underwriting unit assigned manual 3672 [sic] to the policy and removed manual 3336. After the classification change the Bureau audited the employer. Payroll was divided between manual 3672 [sic] and manual 8810. The company cleans, paints, deburs, buffs and finishes plastic or metal parts. Manual 3672 [sic] is the appropriate classification for that type of business. The employer does not qualify for segregated manual classifications. All operations are done at the same location at the same operation. The various types of

work done by this employer are incidental to manual 3672 [sic]. The employer grossly reported its payroll by assigned [sic] operational payroll to manual 8810. The employer is not entitled to prospective audit findings.

**Findings of Fact and Conclusion of Law:**

In order to make a decision on the classification issue, a brief history of the setting of manual classifications must be discussed. Prior to 1993, the bureau used its own system to categorize operations. In 1993, the legislature required the bureau to replace this system with the classifications used by the National Council on Compensation Insurance (NCCI). See R.C. 4123.29(A)(1); Am.Sub.H.B. No. 107, 145 Ohio Laws, Part II, 3113. Under R.C. 4123.29(A)(1), "...subject to the approval of the bureau of workers' compensation board of directors," the duties of the Administrator include "[c]lassify[ing] occupations or industries with respect to their degree of hazard and determin[ing] the risks of the different classes according to the categories the national council on compensation insurance establishes that are applicable to employers in this state[.]" The courts have consistently given deference to the bureau in using this classification system. The Ohio Supreme Court in *State ex Rel. Cafaro Mgt. Co. v. Kielmeyer* (2007) 113 Ohio St.3d 1 stated "[D]eference is required 'in all but the most extraordinary circumstances,' with judicial intervention warranted only when the agency has acted in an 'arbitrary, capricious or discriminatory manner[.]" Citing *State ex Rel Progressive Sweeping Contrs., Inc. v. Ohio Bur. of Workers' Comp.* (1994) 68 Ohio St.3d 393, 395-396.

Ohio Administrative Code 4123-17-08(D), in implementing the NCCI classifications states, "The purpose of the classification procedure is to assign the one basic classification that best describes the business of the employer within a state. Subject to certain exceptions described in this rule, each classification includes all the various types of labor found in a business." Per 4123-17-08, "[t]he purpose of the classification system is to group employers with similar operations into classifications so that [t]he assigned classification reflects the exposures common to those employers [and] [t]he rate charged reflects the exposure to loss common to those employers." Additionally, "[s]ubject to certain exceptions, it is the business of the employer within a state that is classified, not separate

employments, occupations or operations within the business." Ohio Adm.Code 4123-17-08 (A1,2)[.]

Per 4123-17-08(B)(1), "[c]lassifications are divided into two types — basic classifications and standard exception classifications. Basic classifications describe the business of an employer. This term is applied to all classifications listed in this manual, except for the standard exception classifications."

Given the information provided at the hearing, the Adjudicating Committee upholds the classification of manual 3372. The employer's operations are best described by this classification. The employer's operations are cleaning, painting, deburring, buffing and finishing of plastic or metal parts. These operations are best described in manual 3372. The Committee finds that the bureau has properly applied NCCI classifications pursuant to R.C. 4123.29. As the court reiterates, "[d]eference is required in all but the most extraordinary circumstances."

{¶ 47} 24. Relator administratively appealed the December 12, 2012 order of the adjudicating committee to the administrator's designee pursuant to R.C. 4123.291.

{¶ 48} 25. In support of its appeal, relator submitted the affidavit of Sherry Richcreek executed January 25, 2013. The Richcreek affidavit states:

[Two] NHVS International began business on July 1, 2011; and

[Three] NHVS International submitted paperwork in May of 2011 to the Ohio Bureau of Workers' Compensation (herein "BWC"); and

[Four] On June 4, 2011 an auditor, Ed Grau, came to NHVS International's future plan for an audit; and

[Five] NHVS International employees [sic] around 500 employees; and

[Six] Of those employees roughly 30 are employed in the metal finishing operations; and

[Seven] The remaining employees work in the waxwork or ceramic work operations; and

[Eight] These operations are not dependent on each other and can exist as independent operations; and

[Nine] NHVS International's products are ultimately used for airplane turbines; and

[Ten] The waxwork operations include filling small bubbles with wax and rubbing it smooth, marking with a china marker rubbing the part with a scotch brite pad until smooth; and rubbing dye lines off the wax piece.

[Eleven] The ceramic work operations include marking the pieces with markers, tape, glue or small amounts of wax to give them stability; and soap to prevent the customers wax from sticking when it is returned to the customer.

[Twelve] The primary business of NHVS International is working with wax and ceramic cores parts for airplane and turbines and

[Thirteen] The letters and emails attached to this appeal are true and accurate copies of letters and emails I received in the normal course of business; and

[Fourteen] Each operation is separated and protected from the hazards of the other operations at NHVS International's plant; and

[Fifteen] NHVS International is able to split its payroll into metal finishing, waxwork and ceramic work operations; and

[Sixteen] The current premium charge to NHVS International would significantly hinder its ability to continue business[.]

{¶ 49} 26.  In further support of its appeal, relator submitted a report from Edward J. Priz, dated January 31, 2013.  In his eight-page report, Priz states:

### Summary of Opinions

Based upon my review of information regarding the operations of NHVSI, and my experience in the field of the Workers['] Compensation classification system developed by the National Council on Compensation Insurance ("NCCI"), I have formed the following opinions to a reasonable degree of professional certainty:

Classification Code 3672 [sic] is not the correct governing classification for NHVSI, although it is appropriate for one part of their operations;

The Ohio BWC, in its earlier decision to assign Code 3672 [sic], failed to take into account the nature of the work done by the majority of NHVSI workers, and the products produced by NHVSI;

The Ohio BWC also failed to take into consideration the NCCI classification rules that call for assigning more than one classification code to a manufacturing concern under certain circumstances;

Code 4692 is the proper NCCI classification code for most of the manufacturing operations conducted by NHVSI.

Code 4692 closely matches the materials, equipment, work processes, and products of NHVSI in their work with ceramic and wax parts.

* * *

**Metal Finishing at NHVSI**

One part of the operations at NHVSI stands apart from the rest, however, and this appears to have been the part of NHVSI that the earlier BWC classification decisions focused upon. In the metal finishing department, small cast metal parts made by customers of NHVSI are polished and smoothed by means of grinding and sandblasting. This metal finishing department is separated from the rest of the operations of NHVSI by walls and doors, and there is no interchange of labor. This metal finishing department functions separately from the work done by the rest of NHVSI.

NCCI classification rules make it clear that under such circumstances, a separate classification can properly be assigned if "the insured conducts more than one operation in a state.["]

(1) For purposes of this rule, an insured is conducting more than one operation in a state if portions of the insured's operations in that state are not encompassed by the classification applicable to the insured's principal business. To qualify for a separate classification, the insured's

additional operation must meet all of the following conditions:

Be able to exist as a separate business if the insured's principal business in the state ceased to exist.

Be located in a separate building, or on a separate floor in the same building, or on the same floor physically separated from the principal business by structural partitions. Employees engaged in the principal business must be protected from the operating hazards of the separate additional operations.

Maintain proper payroll records.

The metal finishing department of NHVSI meets all of the enumerated criteria. The grinding and sandblasting of metal castings is not contemplated by Code 4692, and is such that it could easily exist as a separate business if the ceramic and wax operations of NHVSI were discontinued. The metal finishing department is separated from the rest of NHVSI by structural walls and doors, and the workers in the ceramic and wax operations are protected from the operating hazards of the metal finishing department. Finally, proper payroll records are maintained that separately record the payrolls of these different operations.

The metal finishing department of NHVSI is properly classified under Code 3372, as NHVSI has already conceded. But the payroll for the metal finishing department constitutes only 29% of the manufacturing payroll of NHVSI. The operations of the metal finishing department are distinct and separate from the ceramic and wax departments.

(Footnote omitted.)

{¶ 50} 27. Following a March 19, 2013 hearing, the administrator's designee issued an order that affirms the order of the adjudicating committee. The March 19, 2013 order explains:

Pursuant to Ohio Revised Code Section 4123.291, this matter came on for hearing before the Administrator's Designee on the employer's appeal of the Administrator's Designee order dated December 12, 2012. At issue before the Administrator's Designee, the employer protested the Auditor's decision to transfer payroll from manual 8810 to the operational manual. Further, the employer objected to the Bureau

assigning manual 3372 as the operational manual for the company.

* * *

The Administrator's Designee adopts the statement of facts contained in the order of the Adjudicating Committee.

Based on the testimony and other evidence presented at the hearing, the Administrator's Designee affirms the Adjudicating Committee's findings, decision, and rationale set forth in the order.

However, this order will specifically address three issues not fully addressed in the order of the Adjudicating Committee[.] 1.) The reason why the audit will not be applied [only] prospectively. 2.) The reason why payroll will not be allowed to be segregated between two operational manual classifications 3.) The reason why manual 3372, not manual 4692 is the appropriate operational manual classification for this employer's operations.

Regarding the denial of the prospective [only] audit findings, ORC 4123.32 states in part:

The administrator of workers' compensation, with the advice and consent of the bureau of workers' compensation board of directors, shall adopt rules with respect to the collection, maintenance, and disbursements of the state insurance fund including all of the following:

(A) A rule providing that the premium security deposit collected from any employer entitles the employer to the benefits of this chapter for the remainder of the six months and also for any additional adjustment period of two months, and, thereafter, if the employer pays the premium due at the close of any six-month period, coverage shall be extended for an additional eight-month period beginning from the end of the six-month period for which the employer pays the premium due;

(B) A rule providing for ascertaining the correctness of any employer's report of estimated or actual expenditure of wages and the determination and adjustment of proper premiums and the payment of those premiums by the employer for or during any period less than eight months

and notwithstanding any payment or determination of premium made when exceptional conditions or circumstances in the judgment of the administrator justify the action.

And Ohio Administrative Code 4123-17-17(C) states "[t]he bureau shall have the right at all times by its members, deputies, referees, traveling auditors, inspectors or assistants to inspect, examine or audit any or all books, records, papers, documents and payroll of private fund, county, or public employer taxing district employers for the purpose of verifying the correctness of reports made by employers of wage expenditures as required by law and rule 4123-17-14 of the Administrative Code. The bureau shall also have the right to make adjustments as to classifications, allocation of wage expenditures to classifications, amount of wage expenditures, premium rates or amount of premium. * * * Except as provided in rule 4123-17-28 of the Administrative Code, no adjustments shall be made in an employer's account which result in increasing any amount of premium above the amount of contributions made by the employer to the fund for the periods involved, except in reference to adjustments for the semi-annual or adjustment periods ending within twenty-four months immediately prior to the beginning of the current payroll reporting period. The twenty-four month period shall be determined by the date when such errors affecting the reports and the premium are brought to the attention of the bureau by an employer through written application for adjustment or from the date that the bureau provides written notice to the employer of the bureau's intent to inspect, examine, or audit the employer's records." The Administrator's Designee finds that the bureau has properly applied that rule. Specifically, the Administrator's Designee finds that the bureau applied the rule in accordance with the following written policy:

- Pull the Application for Coverage and see what operations, duties were listed when they opened their policy.

- Look for a previous audit[.]

- Determine whether the operations changed/were not disclosed or whether the bureau made an error in the classification assignment.

▪ If BWC made the error, the classification should be assigned prospectively and the audit should be revised with no hearing necessary. The employer should be contacted.

Examples of mistakes are: 1) [T]he Bureau originally misclassified the employer's operations when the employer gave an accurate description of their operations on the U3; 2) The BWC had previously given the employer clear instructions on how to report and then the current audit changed those instructions. Under both examples, there should not have been a substantial change in the employer's operations.

The Administrator's Designee finds that the Employer misreported payroll for a [sic] periods immediately prior to the current payroll period. There was no demonstration that the bureau originally misclassified the Employer's operations or that the Employer relied on clear instructions previously provided to it by the bureau. In fact, the employer was the party who requested manual 8810 be added to the policy and then reported clearly operational payroll to the manual.

Regarding the segregation of payroll between two operational manuals, the administrator's designee does not find the employer's arguments to be well founded.

OAC 4123-17-08(D)(3) states in part:

(i) For purposes of this rule, an insured is conducting more than one operation in a state if portions of the insured's operations in that state are not encompassed by the classification applicable to the insured's principal business. To qualify for a separate classification, the insured's additional operation must:

*(a)* Be able to exist as a separate business if the insured's principal business in the state ceased to exist.

*(b)* Be located in a separate building, or on a separate floor in the same building, or on the same floor physically separated from the principal business by structural partitions. Employees engaged in the principal business must be protected from the operating hazards of the separate additional operations.

> *(c)* Maintain proper payroll records. Refer to paragraph (F)(2) of this rule on maintenance of proper payroll records.
>
> **The employer has failed to provide any records to support its contention that the business has two separate and distinct operations which could stand alone if the other operation failed. In fact the Bureau audit supervisor argued that the two operations share incidental employees, do not have segregated payroll records and only recently were the operations separated by physical partitions.**
>
> **Regarding the appropriate manual classification, the Administrator's Designee's [sic] concludes that manual 3372 is the appropriate manual classification for the employer's operations. Manual 3372 applies to metal finishing operations such as polishing and buffing small miscellaneous articles of metal or plastic. Metal deburring operations are classified to manual 3372. The waxing, molding and casting operations are all incidental operations to those operations included in manual 3372. Manual 4692 applies to Dental Laboratories. This employer does not manufacture teeth replacements, dental appliances or enhancement products such as braces, bridges, crowns, dentures, palatal expanders or retainers. Therefore, manual 4692 is not an appropriate manual classification for this employer.**

{¶ 51} 28. On April 29, 2013, relator, NHVS International, Inc., filed this mandamus action.

Conclusions of Law:

{¶ 52} The administrator's designee addressed three issues in his order in the following order: (1) whether the audit findings should be applied prospectively only; (2) whether relator has shown it should be assigned more than one basic classification because it allegedly conducts more than one operation in the state; and (3) whether manual 3372 rather than manual 4692 is the appropriate basic classification.

{¶ 53} The magistrate shall address the issues addressed by the administrator's designee in reverse order: (1) whether the administrator's designee abused his discretion in determining that manual 3372 rather than manual 4692 is the appropriate basic classification; (2) whether the administrator's designee abused his discretion in determining that relator has failed to show that it should be assigned more than one basic

classification; and (3) whether the administrator's designee abused his discretion in determining that the audit findings shall not be applied prospectively only.

{¶ 54} The magistrate finds:  (1) the administrator's designee did not abuse his discretion in determining that manual 3372 rather than manual 4692 is the appropriate basic classification; (2) the administrator's designee did not abuse his discretion in determining that relator has failed to show that it should be assigned more than one basic classification; and (3) the administrator's designee did abuse his discretion in determining that the audit findings shall not be applied prospectively only.

### Basic Law

{¶ 55} In *State ex rel. Ohio Aluminum Industries, Inc. v. Conrad,* 97 Ohio St.3d 38, 2002-Ohio-5307, the Supreme Court of Ohio decided a case involving an employer's mandamus challenge to the bureau's manual reclassification that resulted in a higher premium to the employer. In *Ohio Aluminum,* the court set forth law applicable to the instant case:

> Section 35, Article II of the Ohio Constitution authorizes the board to "classify all occupations, according to their degree of hazard * * *." Implemented by what is now R.C. 4123.29(A)(1), the result is the Ohio Workers' Compensation State Fund Insurance Manual. The manual is based on the manual developed by NCCI and has hundreds of separate occupational classifications. See Ohio Adm.Code 4123-17-04, Appendix A. It also specifies the basic rate that an employer must pay, per $100 in payroll, to secure workers' compensation for its employees. See Ohio Adm.Code 4123-17-02(A).
>
> * * *
>
> "[T]he bureau is afforded a 'wide range of discretion' in dealing with the 'difficult problem' of occupational classification." *State ex rel. Roberds, Inc. v. Conrad* (1999), 86 Ohio St.3d 221, 222, 714 N.E.2d 390, quoting *State ex rel. McHugh v. Indus. Comm.* (1942), 140 Ohio St. 143, 149, 23 O.O. 361, 42 N.E.2d 774. Thus, we have "generally deferred to the [bureau's] expertise in premium matters" and will find an abuse of discretion "only where classification has been arbitrary, capricious or discriminatory." *State ex rel. Progressive Sweeping Contrs., Inc. v. Ohio Bur. of Workers' Comp.* (1994), 68 Ohio St.3d 393, 396, 627 N.E.2d 550. * * *

*Id.* at ¶ 17, 20.

{¶ 56} In *State ex rel. Progressive Sweeping Contrs., Inc. v. Bur. of Workers' Comp.*, 68 Ohio St.3d 393, 396 (1994), the Supreme Court of Ohio pronounced:

> Judicial intervention in premium matters has traditionally been warranted only where classification has been arbitrary, capricious or discriminatory. *Id.;* [ *State ex rel. Minutemen, Inc. v. Indus. Comm.*, 62 Ohio St.3d 158 (1991)]. See, generally, 4 Larson, Workmen's Compensation Law (1990), Section 92.67. Given this high threshold, we have been-and will continue to be-reluctant to find an abuse of discretion merely because the employer's actual risk does not precisely correspond with the risk classification assigned.

{¶ 57} However, in *Progressive Sweeping,* the court issued a writ of mandamus against the bureau. The court explained:

> The bureau should not be permitted under the guise of administrative convenience to shoehorn an employer into a classification which does not remotely reflect the actual risk encountered.

*Id.*

{¶ 58} R.C. 4123.29 currently provides:

> (A) The administrator of workers' compensation, subject to the approval of the bureau of workers' compensation board of directors, shall do all of the following:
>
> (1) Classify occupations or industries with respect to their degree of hazard and determine the risks of the different classes according to the categories the national council on compensation insurance establishes that are applicable to employers in this state.

{¶ 59} Supplementing the statute, Ohio Adm.Code 4123-17-08 provides:

> In accordance with division (A)(1) of section 4123.29 of the Revised Code, the purpose of this rule is for the bureau of workers' compensation to conform the classifications of industries according to the categories the national council on compensation insurance (NCCI) establishes that are applicable to employers in Ohio. This rule is based upon "Rule 1, Classification Assignment," effective January 1, 2002, of the classification rules of the NCCI and "Rule 2G, Interchange of Labor." The rule is used with the permission of the NCCI and is modified to conform to the requirements

of the Ohio administrative code and the bureau of workers' compensation. Where the NCCI scopes of basic manual classifications contains additional rules and information relating to the reporting of payroll or classification of industries under the manual classifications, such scopes and rules shall apply under the rules of the bureau of workers' compensation, unless otherwise specifically excepted.

(A) Classification system.

(1) The purpose of the classification system is to group employers with similar operations into classifications so that:

(a) The assigned classification reflects the exposures common to those employers.

(b) The rate charged reflects the exposure to loss common to those employers.

(2) Subject to certain exceptions, it is the business of the employer within a state that is classified, not separate employments, occupations or operations within the business.

(B) Explanation of classifications.

Classifications are divided into two types - basic classifications and standard exception classifications.

(1) Basic classifications.

Basic classifications describe the business of an employer. This term is applied to all classifications listed in this manual, except for the standard exception classifications.

* * *

(2) Standard exception classifications.

Standard exception classifications describe occupations that are common to many businesses. These common occupations are not included in a basic classification unless specified in the classification working. The standard exception classifications are described below.

(a) Clerical office or drafting employees NOC (code 8810);

\* \* \*

**(5) Governing classification.**

**The governing classification at a specific job or location is the classification, other than a standard exception classification, that produces the greatest amount of payroll.**

\* \* \*

**(6) Principal business.**

**Principal business is described by the classification, other than a standard exception or general exclusion, with the greatest amount of payroll.**

\* \* \*

**(D) Classification procedures.**

**The purpose of the classification procedure is to assign the one basic classification that best describes the business of the employer within a state. Subject to certain exceptions described in this rule, each classification includes all the various types of labor found in a business.**

**It is the business that is classified, not the individual employments, occupations or operations within the business.**

**Certain exceptions apply and are noted below.**

\* \* \*

**(3) Assignment of more than one basic classification.**

**More than one basic classification may be assigned to an insured who meets conditions set forth in paragraphs (D)(3)(a) to (D)(3)(c) of this rule**

\* \* \*

**(c) The insured conducts more than one operation in a state.**

**(i) For purposes of this rule, an insured is conducting more than one operation in a state if portions of the insured's operations in that state are not encompassed by the classification applicable to the insured's principal business.**

To qualify for a separate classification, the insured's additional operation must:

*(a)* Be able to exist as a separate business if the insured's principal business in the state ceased to exist.

*(b)* Be located in a separate building, or on a separate floor in the same building, or on the same floor physically separated from the principal business by structural partitions. Employees engaged in the principal business must be protected from the operating hazards of the separate additional operations.

*(c)* Maintain proper payroll records. Refer to paragraph (F)(2) of this rule on maintenance of proper payroll records.

### Is Manual 3372 the Appropriate Basic Classification?

{¶ 60} The administrator's designee addressed the issue of whether manual 3372 rather than manual 4692 is the appropriate basic classification as follows:

Regarding the appropriate manual classification, the Administrator's Designee's concludes [sic] that manual 3372 is the appropriate manual classification for the employer's operations. Manual 3372 applies to metal finishing operations such as polishing and buffing small miscellaneous articles of metal or plastic. Metal deburring operations are classified to manual 3372. The waxing, molding and casting operations are all incidental operations to those operations included in manual 3372. Manual 4692 applies to Dental Laboratories. This employer does not manufacture teeth replacements, dental appliances or enhancement products such as braces, bridges, crowns, dentures, palatal expanders or retainers. Therefore, manual 4692 is not an appropriate manual classification for this employer.

{¶ 61} The record contains the NCCI manual description for manual 3372:

3372
**PHRASEOLOGY** ELECTROPLATING.
Shall not be assigned to a risk engaged in operations described by another classification unless the operations subject to 3372 are conducted as a separate and distinct business.

**CROSS**-**REF.** *Detinning*—includes incidental manufacturing of tin or tin compounds; *Metal: Finishing.*

**SCOPE** Electroplating—Code 3372 applies to the process of placing a decorative or protective metallic coating on metal or other conducting surfaces by the use of electrolysis. The article to be plated is immersed in a solution containing the necessary chemical mixture. An electric current is then passed through the solution. This process deposits a coating of the desired metal on the article. Gold, nickel and chromium are examples of metals that have been used to coat other metals. Electroplating risks will typically engage in substantial finishing operations consisting of cleaning, polishing and buffing the plated articles.

Anodizing metal articles to prevent or retard oxidation is contemplated by Code 3372. This is analogous to electroplating as the articles are placed in an acid solution followed by the application of an electric charge.

Code 3372 is applicable to metal finishing operations such as polishing and buffing small miscellaneous articles of metal, plastic, etc. This work involves castings, plated sheet metal parts, as well as fine articles such as jewelry, silverware and optical frames.

Metal deburring operations are classified to Code 3372. This operation involves the removal of rough edges or areas from metal goods.

Shot peening of metal parts is assigned to Code 3372 by analogy. This work involves bombarding metal parts with steel or glass shot under controlled conditions to improve the surface structure of the metal.

Detinning—this classification applies to entities engaged in recovering or reclaiming tin from tin plate scrap. The methods in general use follow:

Detinning by chemical process—the scrap is treated with a hot solution of caustic soda in the presence of an oxidizing agent. This causes the tin to precipitate from the scrap. The tin is then collected, washed and pressed into bales.

Detinning by electrolysis—this is an additional step in the recovery by chemicals and involves the introduction of an electric current in the chemical solution. This precipitates a purer form of tin than the tin recovered by the exclusive chemical process.

> Detinning by chlorine process— this is a variation in the chemical recovery method whereby chlorine is forced under pressure into cylinders containing tin plate scrap. The chlorine dissolves the tin, which is then collected.

(Emphasis sic.) (Supplemental stipulation, 6.)

{¶ 62} Apparently, relator does not engage in electroplating which is the caption for manual 3372. *See* Ohio Adm.Code 4123-17-08(C) captioned "Classification wording." Also, relator does not engage in "the use of electrolysis" and it does not engage in "anodizing metal articles." However, that does not mandate a finding that manual 3372 is not the appropriate basic manual because the following portion of manual 3372's description covers relator's operation:

> Code 3372 is applicable to metal finishing operations such as polishing and buffing small miscellaneous articles of metal, plastic, etc. This work involves castings, plated sheet metal parts, as well as fine articles such as jewelry, silverware and optical frames.
>
> Metal deburring operations are classified to Code 3372. This operation involves the removal of rough edges or areas from metal goods.

{¶ 63} Completing the U-3 application for workers' compensation coverage on September 13, 2011, Richcreek described relator's method of operation as:

> Light manufacturing Service. Finish cores, prep cores, assemble wax, wax injection, and metal finishing.

{¶ 64} In her July 25, 2012 e-mail to Best, Richcreek stated:

> Hello John,
>
> We only remove small amounts excess metals from castings provided by our customer, they are polished and or sandblasted and returned to the customer. We do no chemical process at all. Most of our work is bench work with hand files or very small drills, used on ceramic and wax pieces taking dye lines down, addition plastic/wax pieces, everything (including the wax pattern) is supplied by our customer. The metal department is only about 35% of our business.

{¶ 65} In his November 8, 2012 inspection report, Yoder wrote:

> The company's employees debur and polish the customers'
> parts. The parts are metal and plastic.

{¶ 66} Yoder further wrote:

> Manual 3372 is considered correct for the deburring and
> polishing of the customers' parts.

{¶ 67} In the "Employer's Position" portion of the order of the adjudicating committee, the committee states:

> Most workers are not engaged in metal polishing or grinding.
> * * * Only 30-50 workers do metal polishing.

{¶ 68} Under the "Findings" portion of the order, the adjudicating committee states:

> The employer's operations are cleaning, painting, deburring,
> buffing and finishing of plastic or metal parts. These
> operations are best described in manual 3372.

{¶ 69} In the magistrate's view, the U-3 application, the July 25, 2012 e-mail, and Yoder's November 8, 2012 rating inspection report clearly provide some evidence supporting the finding of the administrator's designee that manual 3372 is the appropriate basic manual.  This is particularly so given the deference this court must give to the bureau's expertise in premium matters.  *See, Progressive Sweeping Contrs.*

{¶ 70} Nevertheless, relator argues here that it "has provided ample, convincing evidence that its operations encompass more than just metal and plastic work." (Relator's brief, 23.)  According to relator, "[t]he BWC is stuck on NHVSI's metal and plastic operations." (Relator's brief, 22.)

{¶ 71} Relator further argues that the Richcreek affidavit indicates that only "30 employees out of around 500 are employed in metal finishing areas." (Relator's brief, 24.)

{¶ 72} According to relator, "its primary business is small handheld work on wax and ceramic pieces."  (Relator's brief, 32.)  According to relator, the administrator's designee believed that relator "performs work only on metal and plastic parts." (Relator's brief, 32.)

{¶ 73} Relator's suggestion that the administrator's designee failed to consider the entire record before this court, including the Richcreek affidavit and the Priz report, lacks merit. There is a presumption of regularity that attaches to agency proceedings which would include proceedings of the administrator's designee. *State ex rel. Lovell v. Indus. Comm.*, 74 Ohio St.3d 250 (1996).

{¶ 74} Moreover, the administrator's designee considered relator's alternative manual 4692. That manual is described as follows:

> 4692
>
> **Phraseology** Dental Laboratory
>
> **Scope:** Dental labs manufacture teeth replacement dental appliances or enhancement products such as braces, bridges, crowns, dentures, palatal expanders and retainers. These products are usually ordered by dental professional for use in their practices. Raw materials used by the dental lab include but are not limited to gold, porcelain, plastic, wire and other natural minerals and man-made substances. Tools and equipment used include small hand tools, small grinders, miniature molds, miniature furnaces, work tables and other specialty trade items.

(Emphasis sic.) (Supplemental stipulation, 8.)

{¶ 75} Interestingly, relator never offered manual 4692 until its appeal of the order of the adjudicating committee. The Priz report submitted by relator on appeal is the first instance in the record of relator's claim that manual 4692 is the more appropriate manual. In the magistrate's view, it is rather obvious that manual code 4692 is inappropriate given the availability of manual 3372. In short, relator has failed to submit a viable alternative to manual 3372.

{¶ 76} Based on the forgoing analysis, the magistrate concludes that the administrator's designee did not abuse his discretion in holding that manual 3372 is the appropriate basic classification.

### More Than One Basic Classification?

{¶ 77} The administrator's designee addressed the issue of whether relator should be assigned more than one basic classification because it allegedly conducts more than one operation in the state as follows:

> The employer has failed to provide any records to supports [sic] its contention that the business has two separate and distinct operations which could stand alone if the other operation failed. In fact the Bureau audit supervisor argued that the two operations share incidental employees, do not have segregated payroll records and only recently were the operations separated by physical partitions.

{¶ 78} Apparently, the reference of the administrator's designee to "the Bureau audit supervisor," is a reference to Michael Kennedy who, as earlier noted, is a regional supervisor of the bureau's underwriting and premium audit department. Kennedy authored the September 21, 2011 letter as earlier noted. The order of the administrator's designee indicates that "Mike Kennedy, Audit Supervisor" was present for the bureau at the March 19, 2013 hearing before the administrator's designee.

{¶ 79} Unfortunately, the March 19, 2013 hearing was not recorded so we do not know verbatim what Kennedy said at the hearing. All we know is what the administrator's designee reported—that Kennedy "argued that the two operations share incidental employees, do not have segregated payroll records, and only recently were the operations separated by physical partitions."

{¶ 80} The issue here is whether Kennedy's statement as reported by the administrator's designee is some evidence upon which the administrator's designee can and did rely to support the determination that relator has failed to show that more than one basic classification should be assigned to relator.

{¶ 81} Priz addressed the issue in his January 31, 2013 report in which he states:

**Metal Finishing at NHVSI**

One part of the operations at NHVSI stands apart from the rest, however, and this appears to have been the part of NHVSI that the earlier BWC classification decisions focused upon. In the metal finishing department, small cast metal parts made by customers of NHVSI are polished and smoothed by means of grinding and sandblasting. This metal finishing department is separated from the rest of the operations of NHVSI by walls and doors, and there is no interchange of labor. This metal finishing department functions separately from the work done by the rest of NHVSI.

NCCI classification rules make it clear that under such circumstances, a separate classification can properly be assigned if "the insured conducts more than one operation in a state.["]

(1) For purposes of this rule, an insured is conducting more than one operation in a state if portions of the insured's operations in that state are not encompassed by the classification applicable to the insured's principal business. To qualify for a separate classification, the insured's additional operation must meet all of the following conditions:

Be able to exist as a separate business if the insured's principal business in the state ceased to exist.

Be located in a separate building, or on a separate floor in the same building, or on the same floor physically separated from the principal business by structural partitions. Employees engaged in the principal business must be protected from the operating hazards of the separate additional operations.

Maintain proper payroll records.

The metal finishing department of NHVSI meets all of the enumerated criteria. The grinding and sandblasting of metal castings is not contemplated by Code 4692, and is such that it could easily exist as a separate business if the ceramic and wax operations of NHVSI were discontinued. The metal finishing department is separated from the rest of NHVSI by structural walls and doors, and the workers in the ceramic and wax operations are protected from the operating hazards of the metal finishing department. Finally, proper payroll records are maintained that separately record the payrolls of these different operations.

The metal finishing department of NHVSI is properly classified under Code 3372, as NHVSI has already conceded. But the payroll for the metal finishing department constitutes only 29% of the manufacturing payroll of NHVSI. The operations of the metal finishing department are distinct and separate from the ceramic and wax departments.

(Footnote omitted.)

{¶ 82} The Priz report does not address whether "the two operations share incidental employees" as was stated by Kennedy.  Moreover, while Kennedy stated that the two operations "do not have segregated payroll records," Priz asserts that "proper payroll records are maintained that separately record the payrolls of these different operations."  Also, Priz fails to indicate when the so-called "structural walls and doors" were installed at NHVS's facility.  Kennedy stated that "only recently were the operations separated by physical partitions."

{¶ 83} It was for the administrator's designee to weigh the evidence before him.  The administrator's designee was not required to accept the factual assertions and opinions contained in the Priz report.  Moreover, the administrator's designee was not required to address or even mention the Priz report in his order.  The presumption here is simply that the administrator's designee found the Priz report unpersuasive and, thus, it was not relied upon.  *Lovell.*

{¶ 84} Given the above analysis, the magistrate concludes that the administrator's designee did not abuse his discretion in determining that relator failed to show that it should be assigned more than one basic classification.

### Should the Audit Findings be Applied Prospectively Only?

{¶ 85} Ohio Adm.Code 4123-17-17(C) currently provides:

> The bureau shall have the right at all times by its members, deputies, referees, traveling auditors, inspectors or assistants to inspect, examine or audit any or all books, records, papers, documents and payroll of private fund, county, or public employer taxing district employers for the purpose of verifying the correctness of reports made by employers of wage expenditures as required by law and rule 4123-17-14 of the Administrative Code. The bureau shall also have the right to make adjustments as to classifications, allocation of wage expenditures to classifications, amount of wage expenditures, premium rates or amount of premium. * * * Except as provided in rule 4123-17-28 of the Administrative Code, no adjustments shall be made in an employer's account which result in increasing any amount of premium above the amount of contributions made by the employer to the fund for the periods involved, except in reference to adjustments for the semi-annual or adjustment periods ending within twenty-four months immediately prior to the beginning of the current payroll reporting period. The twenty-four month period shall be determined by the date

when such errors affecting the reports and the premium are brought to the attention of the bureau by an employer through written application for adjustment or from the date that the bureau provides written notice to the employer of the bureau's intent to inspect, examine, or audit the employer's records.

{¶ 86} Recently, in *State ex rel. Aaron Rents, Inc. v. Ohio Bur. of Workers' Comp.,* 129 Ohio St.3d 130, 2011-Ohio-3140, the Supreme Court of Ohio had occasion to interpret Ohio Adm.Code 4123-17-17(C) and to require the bureau to provide an adequate explanation when it determines whether an audit shall be applied retrospectively or prospectively only. In that case, the court states:

Under Ohio Adm.Code 4123-17-17(C), the bureau can make adjustments to an employer's account either prospectively or retroactively. *State ex rel. Granville Volunteer Fire Dept., Inc. v. Indus. Comm.* (1992), 64 Ohio St.3d 518, 520-521, 597 N.E.2d 127. ARI objects to retroactive reclassification and argues, among other things, that its ability to challenge the bureau's decision has been compromised because the order does not explain why retroactive rather than prospective reclassification was favored. We agree.

We "generally defer[ ] to the [bureau's] expertise in premium matters," but we will intercede when an occupational classification has been made in an arbitrary, capricious, or discriminatory manner. *State ex rel. Progressive Sweeping Contractors, Inc. v. Ohio Bur. of Workers' Comp.* (1994), 68 Ohio St.3d 393, 396, 627 N.E.2d 550. The agency's expertise, moreover, "does not supersede the duty this court has imposed upon the Industrial Commission and the bureau to adequately explain their decisions." *State ex rel. Craftsmen Basement Finishing Sys., Inc. v. Ryan,* 121 Ohio St.3d 492, 2009-Ohio-1676, 905 N.E.2d 639, ¶ 15. An order must "inform the parties and potentially a reviewing court of the basis of the [agency's] decision." *State ex rel. Yellow Freight Sys., Inc. v. Indus. Comm.* (1994), 71 Ohio St.3d 139, 142, 642 N.E.2d 378.

ARI contends that without an explanation why its request for prospective application was denied, it cannot know whether the imposition was arbitrary, capricious, or, in this case, punitive. ARI fears that the bureau retroactively reclassified its employees as punishment for what the bureau believed was ARI's deliberate misclassification of its workers. ARI

asserts that if that is the case, it deserves to know so that it can prove that the misclassification was unintentional and consistent with what it believed the bureau desired initially.

ARI's points are valid. There is no way to know why the bureau exercised its reclassification discretion as it did. Further explanation as to why the bureau reached its decision is necessary before we can determine whether an abuse of discretion occurred.

The judgment of the court of appeals is reversed, and a limited writ is granted ordering the bureau to vacate its order, further consider the matter, and issue an amended order including an explanation for its decision.

*Id.* at ¶ 9-13.

{¶ 87} Here, the administrator's designee addressed the issue of whether the audit findings should be applied prospectively only:

Specifically, the Administrator's Designee finds that the bureau applied the rule in accordance with the following written policy:

- Pull the Application for Coverage and see what operations, duties were listed when they opened their policy.

- Look for a previous audit[.]

- Determine whether the operations changed/were not disclosed or whether the bureau made an error in the classification assignment.

- If BWC made the error, the classification should be assigned prospectively and the audit should be revised with no hearing necessary. The employer should be contacted.

Examples of mistakes are: 1) [T]he Bureau originally misclassified the employer's operations when the employer gave an accurate description of their operations on the U3; 2) The BWC had previously given the employer clear instructions on how to report and then the current audit changed those instructions. Under both examples, there should not have been a substantial change in the employer's operations.

> The Administrator's Designee finds that the Employer misreported payroll for a [sic] periods immediately prior to the current payroll period. There was no demonstration that the bureau originally misclassified the Employer's operations or that the Employer relied on clear instructions previously provided to it by the bureau. In fact, the employer was the party who requested manual 8810 be added to the policy and then reported clearly operational payroll to the manual.

{¶ 88} Preliminarily, the magistrate notes that, on May 28, 2014, at the request of the magistrate, the parties filed a supplemental stipulation that identifies the source of the "written policy" that was quoted by the administrator's designee. The supplemental stipulation submits a five-page document which is captioned "Complaint Policy Audit Protest." Thereunder, at page one, the document provides:

> **Unit Responsible:** Underwriting and Premium Audit
> **Policy Effective Date:** June 1, 2008
> **Policy Revision Date:** October 17, 2011

{¶ 89} Presumably this five-page document presents an internal bureau policy that has not been promulgated as an administrative rule and codified in the Ohio Administrative Code. It is not clear whether the document is published and available to the public upon request.

{¶ 90} As earlier noted, the stipulated record indicates that the first payroll report received by relator indicated that relator must report its payroll for the period September 13 through December 31, 2011, and that the premium payment must be received by the bureau by February 29, 2012. On the payroll report received by relator "3336RN Type Foundry" was preprinted by the bureau on the form. No other manual codes were preprinted on the form.

{¶ 91} In her own hand, Richcreek entered manual code "8810" and that 246 workers were covered under manual 8810. Richcreek also entered the words "Metal Finishers" and that 70 workers were covered thereunder. Richcreek calculated relator's premium to be $10,735 and a check in that amount is dated February 29, 2012.

{¶ 92} Later, by letter dated July 25, 2012, director Glass informed relator that manual 3372 with a "Class description" for "Electroplating" was being "activated" effective September 13, 2011 and that manual 3336 with a "Class description" for "Type Foundry"

has been "deactivated" effective January 1, 2012 and July 1, 2012. Also, the letter informed that manual 8810 was being activated regarding the clerical office employees.

{¶ 93} Given that the bureau deactivated manual 3336 and has not contended here that manual 3336 was correct or appropriate for relator's business, it is difficult for the magistrate to agree with the administrator's designee that "[t]here was no demonstration that the bureau originally misclassified the employer's operations." To the contrary, it appears the bureau did in fact originally misclassify relator's operations.

{¶ 94} Moreover, given that the bureau did belatedly activate manual 8810 by letter dated July 25, 2012 retrospective to September 13, 2011, it is difficult for the magistrate to understand why the administrator's designee felt it was significant that relator "was the party who requested manual 8810 be added to the policy."

{¶ 95} The bureau has never contended that relator misstated the nature of its business on the U-3 application for coverage. In that document, Richcreek described relator's operations as "light manufacturing service. Finish cores, prep cores, assemble wax, wax injection, and metal finishing."

{¶ 96} Moreover, it is not clear to this magistrate what is meant by the statement of the administrator's designee that relator "misreported" payroll. Of course, from the hindsight of the bureau's audit it can be said that payroll was misreported. However, the stipulated record contains a check dated July 23, 2012 that pre-dates by two days the July 25, 2012 letter from director Glass. That is to say, the date on the check at least suggests that Richcreek had not been informed of the activation of manual codes 8810 and 3372 at the time she completed the second payroll report.

{¶ 97} Given the above analysis, the portion of the order of the administrator's designee that determines the audit findings shall be applied retrospectively is significantly flawed. However, the magistrate does not intend to suggest that relator's situation necessarily merits prospective application only. The determination of whether the audit findings shall be applied prospectively only is a determination to be made by the administrator's designee. The magistrate concludes, however, that the administrator's designee abused his discretion in determining the audit findings shall be applied retrospectively.

{¶ 98} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent to vacate that portion of the order of its administrator's designee that determined the audit findings shall be applied retrospectively, and, in a manner consistent with this magistrate's decision, enter an amended order that adjudicates relator's protest.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).